No. 22-4609

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

RANDY PRICE,
Defendant–Appellee.

_____

On Appeal from the United States District Court for the
Southern District of West Virginia, No. 2:22-cr-97
(Hon. Joseph R. Goodwin)

_____

**OPENING BRIEF FOR THE UNITED STATES**

_____

WILLIAM S. THOMPSON
United States Attorney

JENNIFER RADA HERRALD
Assistant United States Attorney
Southern District of West Virginia

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 2

ISSUE PRESENTED ........................................................................ 2

STATEMENT OF THE CASE ........................................................... 2

      A.    Procedural History ............................................................. 2

      B.    Relevant Facts .................................................................... 3

      C.    Ruling Under Review ......................................................... 4

SUMMARY OF ARGUMENT .......................................................... 8

ARGUMENT .................................................................................. 10

I.     The District Court Erred by Concluding that 18 U.S.C. § 922(k) Is Unconstitutional. ......................................................... 10

      A.    Legal background .............................................................. 10

      B.    Standard of review ............................................................ 15

      C.    Possession of a firearm with an obliterated serial number is not conduct protected by the Second Amendment's plain text ......... 15

      D.    Section 922(k) is consistent with the historical tradition of firearms regulation. ................................................................. 21

            1.    Section 922(k) is consistent with historical statutes regulating commerce in firearms and gunpowder and requiring the inspection and marking of gun barrels. 21

            2.    The district court applied an unduly restrictive historical test that misreads *Bruen*. ........................... 27

E.     At the very least, the district court erred by concluding that § 922(k) is unconstitutional in all its applications—including its application to felons like Price. .................................................. 31

CONCLUSION ...................................................................................... 34

CERTIFICATE OF COMPLIANCE ........................................................ 35

CERTIFICATE OF SERVICE ................................................................. 36

# TABLE OF AUTHORITIES

## Cases

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019)................................................................ 31

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...........................................................*passim*

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ....................................................... 15

*Folajtar v. Attorney General of the U.S.*,
  980 F.3d 897 (3d Cir. 2020)...................................................... 33

*Fusaro v. Howard*,
  19 F.4th 357 (4th Cir. 2021) .................................................... 34

*Hamilton v. Pallozzi*,
  848 F.3d 614 (4th Cir. 2017) .................................................... 33

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .................................................... 33

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .................................................... 12, 18, 32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)........................................................*passim*

*Range v. Attorney General*,
  53 F.4th 262 (3d Cir. 2022) ..................................................... 33

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) ............................................................... 16

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) (en banc)...............................21, 22

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) .................................................. 13

*United States v. Holton*,
   --- F. Supp. ----, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)...... 15, 26, 31

*United States* v. *Marzzarella*,
   614 F.3d 85 (3rd Cir. 2010) ......................................... 18, 20, 27

*United States v. Mobley*,
   956 F.2d 450 (3d Cir. 1992).................................................. 27

*United States v. Salerno*,
   481 U.S. 739 (1987) ......................................................... 31

*United States v. Wass*,
   954 F.3d 184 (4th Cir. 2020) ................................................ 15

## Federal Statutes and Rules

18 U.S.C. § 922...........................................................*passim*

18 U.S.C. § 924.............................................................. 11

18 U.S.C. § 3231 ............................................................. 2

18 U.S.C. § 3731 ............................................................. 2

Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250 ................ 11

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.................. 11, 30

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-
   351, 82 Stat. 197 .......................................................... 11

Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789................. 11

Fed. R. App. P. 4 ............................................................ 2

## State Statutes

Md. Code Ann., Crim. Law § 6-306 ............................................................. 20

N.C. Gen. Stat. § 14-160.2 .......................................................................... 20

Ohio Rev. Code § 2903.04 ............................................................................ 3

Ohio Rev. Code § 2911.01 ............................................................................ 3

S.C. Code § 16-23-30 .................................................................................. 20

Va. Code § 18.2-311.1 ................................................................................. 20

## Historical Statutes

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ....................................... 16

2 Consolidated Supplement to the Codes and General Laws of the
State of California (1926), Act 1183, § 13 (enacted 1923) .......................... 30

2 General Laws of Massachusetts from the Adoption of the
Constitution to February 1822 (1823) ...................................................... 23

3 Compiled Laws of the State of Michigan (1929), Ch. 280, § 16760
(enacted 1927) ........................................................................................ 30

3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth
Day of October, One Thousand Seven Hundred (1810) ............................. 22

3 Oregon Code 1930 (1930), § 72-213 (enacted 1925) .................................. 30

6 Statutes at Large of Pennsylvania from 1682 to 1801 (1899) ..................... 22

15 The Public Records of the Colony of Connecticut (1890) .......................... 23

Colonial Laws of Massachusetts Reprinted from the Edition of 1672
(1890) ..................................................................................................... 23

Laws and Ordinances of New Netherland (1868) ......................................... 22

Laws of the Commonwealth of Massachusetts from February 28, 1807
to February 28, 1814 (1814) .................................................................. 25

Laws of the Commonwealth of Massachusetts from November 28,
1780 to February 28, 1807 (1807) ..................................................... 24, 25

Laws of the State of Maine (1830) .......................................................... 25, 26

Laws of the State of New Hampshire; with the Constitutions of the
United States and of the State Prefixed (1830) ...................................... 23

The Charter and Ordinances of the City of Providence, with the
General Assembly Relating to the City (1835) ........................................ 23

## Other Authorities

David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious
Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp.
Probs. 147 (Winter 1996) ....................................................................... 18

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249
(2020) ........................................................................................................ 33

R.L. Wilson, Colt: An American Legend (1985) .......................................... 30

Randolph Roth, American Homicide (2009) ............................................... 29

Roger Lane, *Murder in America: A Historian's Perspective*, 25 Crime &
Justice 191 (1999) .................................................................................... 29

Webster's 1828 American Dictionary of the English Language ................... 18

# INTRODUCTION

Federal law makes it unlawful to possess a firearm that has moved in interstate commerce where the firearm's serial number is removed, obliterated, or altered. 18 U.S.C. § 922(k). The district court incorrectly found that this statute facially violates the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Firearms with obliterated serial numbers are not protected by the Second Amendment because "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). And there is no lawful purpose for which to possess a firearm with an obliterated serial number. Moreover, § 922(k) is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, because it is analogous to historical laws that regulated commerce in firearms, required inspection and marking of gun barrels and gunpowder, and, most notably, prohibited altering proof marks on gun barrels. Finally, the district court erred in striking down § 922(k) on its face because the statute is, at the very least, constitutional as applied to felons like the defendant here. This Court should reverse.

## STATEMENT OF JURISDICTION

The United States appeals from the district court's order dismissing Count Two of the indictment against Defendant–Appellee Randy Price in this criminal case. The district court (Goodwin, J.) had jurisdiction under 18 U.S.C. § 3231. The district court entered a memorandum opinion and order dismissing Count Two on October 12, 2022. J.A.97-116. The government filed a timely notice of appeal on October 24, 2022. J.A.117-118; *see* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## ISSUE PRESENTED

Whether the federal prohibition on possessing a firearm with an obliterated serial number, 18 U.S.C. § 922(k), facially violates the Second Amendment.

## STATEMENT OF THE CASE

### A.    Procedural History

A grand jury in the Southern District of West Virginia indicted Price for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count One), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Two). J.A.6-8. The district court granted in part Price's motion to dismiss the indictment, holding that § 922(k)

2

is unconstitutional under the Second Amendment and dismissing Count Two. J.A.100-111, J.A.116. The United States appealed. J.A.117-118.

### B. Relevant Facts

In July 2019, officers with the Charleston (West Virginia) Police Department attempted to stop Price's vehicle for an improper display of registration. J.A.97. Price failed to stop and led officers on a short pursuit before abandoning his car and fleeing on foot. J.A.76-77. Officers arrested him and searched his car, in which they found a .25 caliber Raven Arms MP-25 pistol with an obliterated serial number. J.A.76-77, J.A.97.

As alleged in the indictment, Price has two prior felony convictions from 2002. J.A.6. The first was for Ohio involuntary manslaughter, in violation of Ohio Rev. Code § 2903.04(A). J.A.6. The second was for Ohio aggravated robbery, in violation of Ohio Rev. Code § 2911.01. J.A.6. Public court records indicate that Price was sentenced to concurrent sentences of three years on each count.[1] Those records also indicate that Price was convicted of several other felonies in Cuyahoga County, Ohio, including convictions in 2011 for

---

[1] Cuyahoga County Clerk of Courts, Case Information, No. CR-01-417799-ZA, *State of Ohio v. Randy Price* (June 28, 2022), available at, https://cpdocket.cp.cuyahogacounty.us/CR_CaseInformation_Docket.aspx?q=PJP_GmrS8dEVdDwJ0fkGpA2 (direct link works if retried after clicking "Yes" to conditions of use).

3

abduction, felonious assault, domestic violence, and endangering children, and a conviction in 2002 for attempted aggravated burglary.[2]

In May 2022, a federal grand jury indicted Price for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count One), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Two). J.A.6-8. Price moved to dismiss both counts of the indictment, arguing that §§ 922(g)(1) and 922(k) were unconstitutional based on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). J.A.10-39. Specifically, he argued that both "[f]elon-disarmament laws" and "manufacturer serial number requirements and removal prohibitions" were "unknown to the founding generation" and therefore violate the Second Amendment under *Bruen*. J.A.11-12.

## C.    Ruling Under Review

After a hearing on the motion, J.A.78-94, the district court granted Price's motion to dismiss as to Count Two but denied it as to Count One, J.A.97. The court first considered whether § 922(k) "prohibits conduct that is

---

[2] *See* Cuyahoga County Clerk of Courts, Case Information, Case Nos. CR-10-542324-A and CR-92-280616-A, available at https://cpdocket.cp. cuyahogacounty.us/CR_CaseInformation_Docket.aspx?q=DA0liled8petgAE NEQfrfg2, and https://cpdocket.cp.cuyahogacounty.us/CR_CaseInformation _Docket.aspx?q=iLle0nChUu2WbLC_qmh61Q2 (direct links work if retried after clicking "Yes" to conditions of use); *see also* J.A.76.

protected by the plain text of the Second Amendment." J.A.101. The court

rejected the government's argument that § 922(k) was a "commercial

regulation" that did not "infringe" on the right to keep and bear arms. J.A.101

(quotation marks omitted). Section 922(k), the court said, was not a

commercial regulation because it "criminalizes the mere *possession* of a firearm

after a serial number is removed, obliterated, or altered in any way, whether or

not the firearm is then placed into commerce." J.A.102.

The district court gave the example of a "law-abiding citizen" who

purchased a firearm that "complies with the commercial regulation that it bear

a serial number." J.A.102. The citizen then "removes the serial number" with

"no ill intent and never takes any otherwise unlawful action with the firearm."

J.A.102. In this example, the court said, § 922(k) operates as an

"infringement" on the person's right to bear arms because his possession of the

firearm "became illegal only because the serial number was removed."

J.A.102. In the court's view, "[t]hat is the definition of an infringement on

one's right to possess a firearm." J.A.102.

Having found that "[t]he conduct prohibited by Section 922(k) falls

squarely within the Second Amendment's plain text," the district court next

considered whether "the Government can show that 'it is consistent with the

Nation's historical tradition of firearm regulation.'" J.A.103 (quoting *Bruen*,

5

142 S. Ct. at 2130).  In the district court's view, a regulation "is unconstitutional" under *Bruen* if it "confronts a longstanding 'perceived societal problem' that the founders could have addressed but either did not address or addressed through 'materially different means.'"  J.A.105 (quoting *Bruen*, 142 S. Ct. at 2131).

The district court concluded that the "societal problems" addressed by § 922(k) are preventing "crime" and "assisting law enforcement in solving crime."  J.A.108 (brackets omitted).  The court said it was "difficult to imagine that th[ese] societal problem[s] did not exist at the founding," as there "certainly were gun crimes that might have been more easily investigated if firearms had to be identifiable by a serial number or other mark."  J.A.108. Yet it was "undisputed that serial numbers were not required, or even in common use, in 1791."  J.A.106.  Instead, the court said, serial numbers "arose only with the advent of the mass production of firearms."  J.A.106. Serial numbers were not "broadly required for all firearms manufactured and imported in the United States until the passage of the Gun Control Act of 1968."  J.A.106.  And Congress did not prohibit the "mere possession of a firearm that had the serial number altered or removed" until 1990.  J.A.107.

"Even assuming the societal problem addressed by [§ 922(k)] is 'unprecedented,'" the district court concluded that the government had not

met its burden of showing a historical analogue. J.A.109. The court rejected the government's argument that firearms with obliterated serial numbers were "dangerous and unusual" rather than being "in common use." J.A.109 (quotation marks omitted). The court said that "the presence or lack of a serial number makes no difference with respect to whether the type of weapon is commonly used." J.A.109-110. And the court found no evidence that "a firearm without a serial number would meet the historical definition of a dangerous or unusual firearm." J.A.110. The court recognized that "there is an argument . . . that firearms with an obliterated serial number are likely to be used in violent crime and therefore a prohibition on their possession is desirable." J.A.110. But, the court said, "that argument is the exact type of means-end reasoning the Supreme Court has forbidden [the court] from considering." J.A.110. Because the government had not met its burden of showing a historical analogue, the court said it had "no choice but to find 18 U.S.C. § 922(k) unconstitutional." J.A.111.

The district court held, however, that § 922(g)(1)'s prohibition on firearm possession by felons was constitutional even after *Bruen*. J.A.111-115. The court explained that the Supreme Court's Second Amendment decisions do not call into question "longstanding prohibitions on the possession of firearms by felons." J.A.115 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626

(2008)). Accordingly, the district court dismissed only Count Two. J.A.116. After the government filed a notice of appeal, the district court cancelled the scheduled trial on Count One and stayed the case pending appeal. J.A.5 (Docket Entry 52).

## SUMMARY OF ARGUMENT

The district court erred by striking down § 922(k) as unconstitutional under the Second Amendment. Under the *Bruen* framework, § 922(k) does not burden conduct protected by the Second Amendment's plain text. In interpreting that text, the Supreme Court has definitively said that the Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). And firearms with obliterated serial numbers are *not* typically possessed by law-abiding citizens for lawful purposes. Indeed, the only reason to possess such a firearm is to evade detection by law enforcement. Because possession of such firearms is not protected by the Second Amendment's plain text, this Court should affirm.

If the Court looks beyond the Second Amendment's plain text, a review of "the Nation's historical tradition of firearm regulation" confirms that § 922(k) is constitutional. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). Colonial and early state governments regulated many

8

aspects of the firearms trade. They heavily regulated the storage and transportation of gunpowder, in some states requiring that powder be inspected and marked. And, notably, two states in the early 1800s required that gun barrels be proved and marked, imposing criminal penalties for altering or removing the proof marks.

Accordingly, § 922(k) satisfies *Bruen*'s historical analogue test, which does not require a "historical twin," but considers "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis omitted). Section 922(k) imposes, at most, a limited burden on the right to self-defense because firearms *with* serial numbers are far more common and just as usable as firearms with obliterated serial numbers. And any burden imposed by § 922(k) is comparable in its justification to historical laws, which were designed to prevent firearms from falling into the wrong hands, to prevent firearm accidents, and allow the tracing of firearms and gunpowder to specific inspectors.

In any event, the district court erred by striking down § 922(k) on its face. Even if the statute were unconstitutional in some of its applications, it would at least be constitutional as applied to convicted felons like Price. Because Price has been convicted of several felonies, he is statutorily barred

from possessing all firearms under § 922(g)(1).  The district court correctly recognized that this categorical ban is consistent with the Second Amendment. It follows that Price cannot successfully challenge § 922(k)'s ban on possessing a particular type of firearm: one with an obliterated serial number.  This Court should reverse the district court's erroneous decision to strike down § 922(k) on its face.

## ARGUMENT

### I.     The District Court Erred by Concluding that 18 U.S.C. § 922(k) Is Unconstitutional.

The district court erred by concluding that § 922(k) is unconstitutional on its face.  The statute does not burden conduct that is protected by the Second Amendment's text.  It is consistent with the Nation's historical tradition of firearms regulation, which includes early laws prohibiting alteration of proof marks on gun barrels.  And, at the very least, it is not unconstitutional in all its applications, including as applied to Price himself.

#### A.     Legal background

Section 922(k) makes it "unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered" or "to possess or receive" any such firearm that has, "at any time, been shipped or transported in interstate or foreign commerce."  18

10

U.S.C. § 922(k).  The statute carries a five-year statutory maximum.  18 U.S.C. § 924(a)(1)(B).  Congress adopted § 922(k)'s precursor in the Federal Firearms Act of 1938, which made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251.  Congress included an almost identical provision in the Omnibus Crime Control and Safe Streets Act of 1968.  Pub. L. No. 90-351, § 902, 82 Stat. 197, 231.  It then added the prohibition on "possess[ing]" a firearm with an obliterated serial number as part of the Crime Control Act of 1990.  Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856.  By its terms, § 922(k) does not apply to firearms manufactured or imported without serial numbers before 1968, when Congress required serial numbers on all new and imported firearms.  *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1223.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense.  *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  *Heller* said

11

that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26. In *McDonald*, a plurality of the Court again emphasized that applying the amendment to the states "does not imperil every law regulating firearms." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (opinion of Alito, J.).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156. But, as Justice Kavanaugh emphasized in concurrence (joined by the Chief Justice), "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). Justice Alito likewise echoed the point that *Bruen* does

12

not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying guns." *Id.* at 2157 (Alito, J., concurring).

*Bruen* rejected the "two-step" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. Under that two-step framework, courts first engaged in a "historical inquiry . . . to determine whether the conduct at issue was understood to be within the scope of the [Second Amendment] right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). "If the challenged regulation burden[ed] conduct that was within the scope of the Second Amendment," then courts "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.* *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* clarified the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text

13

covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

*Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (quotation marks omitted). Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when in engaging in an analogical inquiry." *Id.* at 2133 (emphasis and quotation marks omitted).

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at

2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue' . . . ." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Since *Bruen*, no court of appeals has addressed the constitutionality of § 922(k). The two district courts to do so have come to opposite conclusions. *See* J.A.97 (concluding that § 922(k) is unconstitutional); *United States v. Holton*, --- F. Supp. ----, 2022 WL 16701935, at *4-5 (N.D. Tex. Nov. 3, 2022) (holding that § 922(k) is constitutional).

### B.    Standard of review

This Court "review[s] a district court's decision to grant a motion to dismiss an indictment *de novo.*" *United States v. Wass*, 954 F.3d 184, 187 (4th Cir. 2020) (quotation marks omitted).

### C.    Possession of a firearm with an obliterated serial number is not conduct protected by the Second Amendment's plain text.

The district court erred by concluding that possession of a firearm with an obliterated serial number is protected by the Second Amendment's plain text. Under *Bruen*, the first question when considering the constitutionality of

15

a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126.  But that plain text cannot be read in isolation.  "[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592.  And the Supreme Court's interpretation of the Second Amendment's plain text in several cases demonstrates that the right does not extend to possession of a firearm with an obliterated serial number because such a firearm is not "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, and is not necessary to protect the right to self-defense.

*Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right.  *Id.* at 593.  Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441).  Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

16

*Heller* outlined several of the limitations inherent in the Second Amendment's text.  It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment.  *Heller*, 554 U.S. at 626.  It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27.  And, as "another important limitation on the right to keep and carry arms," the Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time."  *Id.* at 627 (quotation marks omitted).  Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Possession of firearms with an obliterated serial number is not protected by the Second Amendment's plain text for at least two reasons.  First, firearms with obliterated serial numbers are not "typically possessed by law-abiding citizens for lawful purposes," even putting aside § 922(k)'s prohibition on such possession.  *Heller*, 554 U.S. at 625.  As the Third Circuit has observed, "we . . . cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm."  *United States* v. *Marzzarella*, 614 F.3d 85, 99 (3rd Cir.

17

2010). *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase). Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Marzzarella*, 614 F.3d at 99.

Second, § 922(k)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But "the presence of a serial number does not impair the use or functioning of a weapon in any way." *Marzzarella*, 614 F.3d at 94. A person desiring to defend himself can do so with either a serialized firearm or a pre-1968 or privately made firearm lacking a serial number. Such firearms are far more common and easier to obtain than those with obliterated serial numbers.

Any burden that § 922(k) imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not

18

infringe on that right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 922(k)'s ban on possession of firearms with obliterated serial numbers—a small class of hard-to-obtain firearms—is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

In reaching the opposite conclusion, the district court relied on a hypothetical "law-abiding citizen" who lawfully purchases a firearm and then "removes the serial number" with "no ill intent." J.A.102. This hypothetical

19

scenario misses the mark for several reasons. First, if a person knows about federal or state prohibitions on removing serial numbers, he cannot be said to have "no ill intent."[3] Knowingly violating the law is incompatible with good faith.

Second, the hypothetical is fanciful. A law-abiding citizen would have no reason to remove a serial number from a firearm. Serial numbers are not a firearm accessory that can easily be removed at will; they are stamped or engraved into the firearm's receiver or frame. Defacing the serial number reduces the firearm's value both by damaging the firearm's original finish and appearance and by making it much more difficult to trace the firearm's provenance and year of manufacture. And removing the serial number makes a firearm far less likely to be recovered if stolen. Only someone attempting to avoid detection of a past or future crime would have a motive to obliterate a serial number. *See Marzzarella*, 614 F.3d at 99. The Second Amendment does not protect such conduct, nor does it protect the right to possess such a firearm.

---

[3] Many states prohibit the removal of serial numbers or possession of firearms with removed serial numbers. *See, e.g.,* Va. Code § 18.2-311.1; N.C. Gen. Stat. § 14-160.2; S.C. Code § 16-23-30(C); Md. Code Ann., Crim. Law § 6-306.

**D.    Section 922(k) is consistent with the historical tradition of firearms regulation.**

Even if the conduct regulated by § 922(k) were presumptively protected under the Second Amendment's plain text, the statute would be constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  As explained below, § 922(k) is analogous to historical laws regulating firearms and gunpowder—most notably laws prohibiting alteration of proof marks on gun barrels.  In its contrary ruling, the district court applied too strict a historical test.

**1.    Section 922(k) is consistent with historical statutes regulating commerce in firearms and gunpowder and requiring the inspection and marking of gun barrels.**

Section 922(k) is consistent with a variety of historical laws regulating firearms and gunpowder.  Well before serial numbers became common, colonial and state legislatures regulated firearms and the firearms trade.  *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc) ("[C]olonial governments substantially controlled the firearms trade.").  For example, Connecticut banned residents from selling firearms outside the colony.  *Id.*  Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*."  *Id.* at 685 n.18 (emphasis added; quotation marks omitted).  And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or

21

ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to § 922(k), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller et al v. Bonta, et al.*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a

public magazine, with the inspector marking each cask as either

"Massachusetts Inspected Proof" or "Condemned" and adding his name and

the year.  2 General Laws of Massachusetts from the Adoption of the

Constitution to February 1822, at 199 (1823).  The law imposed a fine of

between $200 and $500 on any person who sold any condemned powder or

"fraudulently alter[ed], or deface[d] any mark, or marks, placed by any

inspector upon any cask or casks containing gunpowder." *Id.*  New

Hampshire adopted a very similar law in 1820.  Laws of the State of New

Hampshire; with the Constitutions of the United States and of the State

Prefixed 277 (1830).

Colonial and early state governments likewise prohibited the

manufacture and transportation of gunpowder without a license.  *See* Colonial

Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890)

(1651 statute) ("no person . . . shall transport any Gun-powder out of this

Jurisdiction, without license first obtained from some two of the Magistrates");

15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute)

(no "gun-powder made and manufactured . . . shall be exported out of the

[Colony] without . . . license"); The Charter and Ordinances of the City of

Providence, with the General Assembly Relating to the City 37 (1835) (1821

23

law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller*, 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.*

Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra*, at 260. The act imposed a ten-dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid."

24

*Id.* at 260.  It also imposed a ten-dollar fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth.  *Id.* at 260-61.  And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel."  *Id.* at 261.  Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's stamp.  Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).[4]

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830).  Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof.  *Id.*  The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol

---

[4] Although the government cited the 1814 barrel-inspection law below, J.A.53, the district court said it had not been presented with any evidence of a regulation that "required firearm owners to keep an identifiable mark on their firearm and never change or remove that mark, with criminal penalties levied against violators," J.A.105 n.3.

25

barrel, without having the same first proved, marked and certified." *Id.*
Additionally, it imposed a fine of "not more than one hundred dollars, nor less
than twenty dollars," for any person who "shall falsely alter the stamp or mark
or the certificate of any prover of firearms." *Id.*

Although these statutes are not identical to § 922(k), they are "relevantly
similar." *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government
need only identify a "historical *analogue*, not a historical *twin*." *Id.* at 2133.
The ultimate question is "whether modern and historical regulations impose a
comparable burden on the right of armed self-defense and whether that burden
is comparably justified." *Id.* at 2133. As explained above, § 922(k) imposes a
minimal "burden on the right of armed self-defense" because marked firearms
are ubiquitous and just as effective for self-defense as unmarked firearms. That
burden is no greater than the burdens imposed by historical laws relating to the
sale and marking of firearms and gunpowder. And neither the historical laws
nor § 922(k) deprived citizens of the use of firearms for self-defense. *See Holton*,
2022 WL 16701935, at *5 (observing that "[*n*]*ot removing* the serial number
from a firearm" is a "negligible burden" compared to historical restrictions on
firearm possession).

Section 922(k) is also "comparably justified." The historical regulations
on commerce in firearms were designed to keep firearms out of the hands of

those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 922(k) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella*, 614 F.3d at 98; *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992). Although § 922(k) does not reflect precisely the same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

### 2. The district court applied an unduly restrictive historical test that misreads *Bruen*.

The district court misunderstood the analogical inquiry required under *Bruen*. The district court stated that, "[w]here the regulation confronts a longstanding 'perceived societal problem' that the founders could have addressed but either did not address or addressed through 'materially different means,' the regulation is unconstitutional." J.A.105 (quoting *Bruen*, 142 S. Ct. at 2131). But *Bruen* does not establish such a categorical rule. *Bruen* said that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the founding generation's failure to address that problem or its decision to do so through "materially different means" is

27

"relevant evidence" or "could be evidence" that a "modern regulation is unconstitutional." *Bruen*, 142 S. Ct. at 2131. That is a far cry from saying that a regulation "is unconstitutional" simply because the founding generation did not address a societal problem in the same way.

The district court's approach reads far too much into legislative silence. *Bruen* correctly observed that if analogous legislative proposals were "rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Bruen*, 142 S. Ct. at 2131. But the mere failure of states to enact a specific law is even less "probative" of that law's unconstitutionality than a state's considering the law and rejecting it on constitutional grounds. Although *Bruen* said that such legislative silence was "relevant" and "could be evidence" of unconstitutionality, *id.*, its probative value is low because legislatures cannot be presumed to always legislate to the limits of their constitutional authority.

Moreover, *Bruen* recognized that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" and that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Although the Second Amendment's "meaning is fixed," its text "can,

and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

Section 922(k) addresses the societal problems of gun violence and the attendant difficulties in investigating and prosecuting such violence. Although those problems existed to some degree at the time of the founding, they did not "preoccup[y] the Founders." *Bruen*, 142 S. Ct. at 2132. "In America during the colonial period, white-on-white [murder] rates were remarkably low . . . . Those patterns continued after the American Revolution and into the early national period . . . ." Roger Lane, *Murder in America: A Historian's Perspective*, 25 Crime & Justice 191, 205 (1999). *See* Randolph Roth, American Homicide 61, 180, 199-200, 299 (2009) (explaining that murder rates dropped significantly in America in the late 1600s but rose precipitously in the late 1840s and 1850s). Thus, it is unsurprising that Congress founding-era legislatures did not combat gun violence in the same way and to the same degree as in later eras.

Moreover, § 922(k) is based at least in part on "technological changes" that occurred after the founding. *Bruen*, 142 S. Ct. at 2132. The mass production of firearms led both to the increased availability and potential misuse of firearms, as well as the widespread use of serial numbers. As the district court pointed out, J.A.106, serial numbers were uncommon on

29

American-made firearms at the time of the founding. Although Samuel Colt

began using serial numbers on his firearms as early as 1837,[5] other

manufacturers did not begin to adopt them until the 1850s and 1860s.[6] States

began to prohibit the obliteration of serial numbers in the 1920s.[7] And

Congress first required that firearm manufacturers and importers mark all

firearms with serial numbers in the Gun Control Act of 1968. *See* Pub. L. No.

90-618, § 102, 82 Stat. 1213, 1223.

The district court incorrectly interpreted this history as establishing

§ 922(k)'s unconstitutionality. J.A.106. In fact, it shows that gun

manufacturing technology at the time of the Second Amendment would have

---

[5] *See* R.L. Wilson, Colt: An American Legend 16, 362 (1985).

[6] Smith & Wesson began using serial numbers at least by 1857. *See* NRA Museums, Smith & Wesson No. 1 1st Issue revolver w/ Original Gutta Percha Case, https://perma.cc/46F7-BTZL. Henry Rifles carried serial numbers when they were first manufactured in 1860. *See* The Winchester Arms Collectors Association, 1860 Henry Rifles, https://perma.cc/W9CJ-L66H. The federal armory at Springfield, Massachusetts began using serial numbers in 1865. *See* National Park Service, Firearm Serial Numbers, https://perma.cc/3S3D-CDT6. And Winchester began using serial numbers with its very first rifle model in 1866. *See* Winchester Repeating Arms, Winchester Firearms Manufacturing Dates by Serial Number and Year 1866 through the early 1990s, https://perma.cc/J5B2-SLCM.

[7] *See, e.g.*, 2 Consolidated Supplement to the Codes and General Laws of the State of California 2627 (1926), Act 1183, § 13 (enacted 1923); 3 Oregon Code 1930 at 5498 (1930), § 72-213 (enacted 1925); 3 Compiled Laws of the State of Michigan 5859 (1929), Ch. 280, § 16760 (enacted 1927).

made a statute exactly like § 922(k) unrealistic.  Although founding-era legislatures could have required all firearms to be surrendered to a centralized authority to be marked, the prospect of sequentially numbering mass-produced firearms at the time of manufacturing was decades away.

But *Bruen* makes clear that a regulation is not unconstitutional merely because it would have been "unimaginable at the founding" or is not a "dead ringer for historical precursors."  *Bruen*, 142 S. Ct. at 2132-33. As explained, some states adopted laws similar to § 922(k) laws that prohibited the alteration of proof marks on gun barrels.  And, given the changes in technology and legislative priorities, § 922(k) is "analogous enough" to historical laws "to pass constitutional muster."  *Id.* at 2133; *see Holton*, 2022 WL 16701935, at *5.  The district court's contrary conclusion was error.

### E. At the very least, the district court erred by concluding that § 922(k) is unconstitutional in all its applications—including its application to felons like Price.

Finally, the district court erred by finding § 922(k) unconstitutional on its face.  *See* J.A.97, J.A.111.  "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (a facial challenge is a claim that a law "is

31

unconstitutional in all its applications"). Here, the district court failed to hold Price to his "heavy burden to demonstrate that [§ 922(k)] is 'facially' unconstitutional," *Salerno*, 481 U.S. at 745, because § 922(k) clearly has some constitutional applications, including to Price himself.

As a convicted felon, Price is statutorily barred from possessing *any* firearm, with or without an obliterated serial number. *See* 18 U.S.C. § 922(g)(1). And, as the district court recognized, Congress's categorical ban on possession of firearms by felons is consistent with the Second Amendment. The Supreme Court has repeatedly stated that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep and bear arms, and has emphasized that its decisions do not "cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626-27 & n.26, 635; *see also McDonald*, 561 U.S. at 786 (opinion of Alito, J.) ("repeat[ing]" these "assurances" from *Heller*); *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156 (characterizing the holders of Second Amendment rights as "law-abiding" citizens fourteen times); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating the Court's assurances regarding felon-possession laws specifically); *id.* at 2157 (Alito. J., concurring) (explaining that *Bruen* does not "disturb[] anything that [the Court] said in

32

*Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns").

This Court has likewise held, under the first step of its pre-*Bruen* Second Amendment framework, that "conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the Second Amendment, absent . . . narrow exceptions" that do not apply here. *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (quotation marks omitted). And, since *Bruen*, every court to consider the issue has upheld § 922(g)(1) against Second Amendment challenges. *See Range v. Attorney General*, 53 F.4th 262, 268 n.6 (3d Cir. 2022) (per curiam) (upholding 18 U.S.C. § 922(g)(1) and citing district court cases doing the same).[8]

-----

[8] A few judges and commentators have maintained that the Second Amendment allows disarming only *dangerous* felons. *See Kanter v. Barr*, 919 F.3d 437, 451, 454, 464 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 912-15 (3d Cir. 2020) (Bibas, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 257-67 285-86 (2020). That minority view is incorrect. *See Range*, 53 F.4th at 283 (rejecting this view after a textual analysis and a "review of the historical record"). But this Court need not reach the issue because Price could be disarmed on account of his felony status even under that minority view. Publicly available records show that he has felony convictions for involuntary manslaughter, aggravated robbery, abduction, felonious assault, domestic violence, endangering children, and attempted aggravated burglary. *See supra*, pages 2-3. Thus, he is a dangerous felon by any standard.

Because Congress may prohibit felons like Price from possessing any firearms, it also may ban possession of a particularly problematic subset of firearms—those with obliterated serial numbers. And because § 922(k) is constitutional as applied to Price, the district court erred by finding it unconstitutional on its face. As this Court has recognized, "if a litigant loses an as-applied challenge because the court rules as a matter of law that the statute or ordinance was constitutionally applied to him, it follows *a fortiori* that the law is not unconstitutional in all applications." *Fusaro v. Howard*, 19 F.4th 357, 373 (4th Cir. 2021) (brackets and quotation marks omitted).

## CONCLUSION

This Court should reverse the judgment of the district court.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

KENNETH A. POLITE, JR.
Assistant Attorney General

JENNIFER RADA HERRALD
Assistant United States Attorney
Southern District of West Virginia

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

34

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because this brief contains 7,624 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/William A. Glaser
WILLIAM A. GLASER
