22-4609

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

## 𝔉𝔬𝔲𝔯𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff/Appellant,*

— v. —

RANDY PRICE,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

## BRIEF OF APPELLEE

WESLEY P. PAGE
FEDERAL PUBLIC DEFENDER

LEX A. COLEMAN
SENIOR LITIGATOR, AFPD

JONATHAN D. BYRNE
APPELLATE COUNSEL
OFFICE OF THE FEDERAL PUBLIC DEFENDER
300 Virginia Street East, Room 3400
Charleston, West Virginia 25301
(304) 347-3350

*Counsel for Appellee*

COUNSEL PRESS • VA – (804) 648-3664

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

ISSUE FOR REVIEW .......................................................................... 1

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ........................................................................................ 2

I.    The district court correctly found that possession of an unserialized firearm is conduct protected by the Second Amendment's plain text – such that the presumption of unconstitutionality applied to Section 922(k) under *Bruen*'s first prong.................................................................................... 4

    A.    Standard of Review.................................................................. 4

    B.    The specific "conduct" protected by the Second Amendment's plain text is to keep and bear arms in case of confrontation.......................................................................... 4

    C.    Price possessed a handgun, which was a firearm in common use at the time................................................................ 5

    D.    The absence of a serial number does not remove Price's handgun from the Second Amendment's plain text...................... 6

        1.    Unserialized firearms are *not* dangerous or unusual weapons, or possessed by law abiding citizens for unlawful purposes .................................................... 7

        2.    Section 922(k) infringes on the right to keep and bear arms ................................................................... 10

    E.    The district court's straightforward application of *Bruen*'s first prong should be affirmed ........................................ 13

II.    The district court correctly found Section 922(k) is not consistent with any distinctly similar historical tradition of firearm regulation at the time of the Founding ........................................ 13

    A.    Standard of Review................................................................ 13

    B.    "At the time of the Founding" directs *Bruen*'s historical inquiry for federal firearm regulations............................................ 14

i

C.    *Bruen*'s "distinctly similar" and "relevantly similar" inquiries are alternative analogical tools. *Bruen*'s "relevantly similar" inquiry is only available under limited circumstances, and is not a supplemental "do over" for regulations failing *Bruen*'s "distinctly similar" standard ................ 17

D.    The societal problems addressed by Section 922(k) existed at the time of the Founding, and were neither "unprecedented", "unimaginable at the founding," or based on any "dramatic technological changes" ........................... 20

E.    The district court did not misunderstand the analogical analysis to be applied under *Bruen* .................................... 21

F.    Section 922(k) is not consistent with any distinctly similar firearm regulation that existed at the time of the Founding ................................................................................. 22

G.    Section 922(k) is also not consistent with any other "relevantly similar" historical firearm regulation that existed between 1791 and 1821 ........................................ 24

III.    The district court did not err finding Section 922(k) facially unconstitutional.  Section 922(k) is not constitutional as applied to Price simply because he is a convicted felon and thereby prohibited from firearm possession through application of another statute ................................................................ 29

A.    Standard of Review ........................................................ 29

B.    Section 922(k) is facially unconstitutional ...................... 29

CONCLUSION ................................................................................. 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*City of Los Angeles, Calif. v. Patel,*
  576 U.S. 409 (2015) ..................................................................30, 31

*District of Columbia v. Heller,*
  554 U.S. 570, 128 S. Ct. 2783 (2008)....................................... *passim*

*Friedman v. City of Highland Park, Ill.,*
  577 U.S. 1039, 136 S. Ct. 447 (2015)........................................... 12

*Johnson v. United States,*
  576 U.S. 591 (2015) ...................................................................... 30

*McDonald v. City of Chicago,*
  561 U.S. 742, 130 S. Ct. 3020 (2010)............................................. 6

*New York State Rifle & Pistol Ass'n Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) .......................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island,*
  2022 WL 17721175 (D.R.I. 2022) ............................................12-13

*Olmstead v. United States,*
  227 U.S. 438 (1928) ...................................................................... 10

*Raffone v. Adams,*
  468 F.2d 860 (2d Cir. 1972)............................................................ 2

*Spencer v. Nigrelli,*
  2022 WL 17985966 (W.D.N.Y. 2022)........................................... 29

*United States v. Bostic,*
  168 F.3d 718 (4th Cir. 1999) ................................................4, 14, 29

*United States v. Carter,*
  750 F.3d 462 (4th Cir. 2014) ........................................................... 3

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ........................................................... 3

*United States v. Cruikshank,*
  92 U.S. 542 (1875) ........................................................................ 14

*United States v. Engle,*
    676 F.3d 405 (4th Cir. 2012) ............................................................. 4

*United States v. Harris,*
    720 F.3d 499 (4th Cir. 2013) ............................................................. 9

*United States v. Holton,*
    ___ F. Supp. 3d ___, 2022 WL 16701935  (N.D. Tex. 2022)................... 18

*United States v. Hosford,*
    843 F.3d 161 (4th Cir. 2016) ............................................................. 3

*United States v. Johnson,*
    497 F.3d 548 (4th Cir. 1974) ............................................................. 2

*United States v. Kelly,*
    2022 WL 17336578 (M.D. Tenn. 2022)................................................ 12

*United States v. Lewis,*
    2023 WL 187582 (W.D. Okla. 2023)................................................... 19

*United States v. Love,*
    2022 WL 17829438 (N.D. Ind. 2022) ................................................. 15

*United States v. Mahin,*
    668 F.3d 119 (4th Cir. 2012) ............................................................. 3

*United States v. Miller,*
    307 U.S. 174 (1939) ........................................................................ 7

*United States v. Moore,*
    666 F.3d 313 (4th Cir. 2012) .....................................................4, 14, 29

*United States v. Pruess,*
    703 F.3d 242 (4th Cir. 2012) ............................................................. 3

*United States v. Rahimi,*
    ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023) ................................4, 13-14, 29, 32

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................29, 30

*United States v. Tita,*
    2022 WL 17850250 (D. Md. 2022) ...................................................... 18

iv

**Statutes & Other Authorities:**

U.S. Const. amend II ................................................................ *passim*

18 U.S.C. § 922(g)(1) ........................................................ 11, 30, 32

18 U.S.C. § 922(k) .................................................................. *passim*

18 U.S.C. § 922(n) ........................................................................ 12

American Gun Facts, *How Many Guns are in the US?* (updated January 16, 2023) .......... 6

Fed. R. App. R. 28(b) ..................................................................... 1

Fed. R. Crim. P. 12 ......................................................................... 4

George Harris, *What Does It Mean to Proof a Firearm?*, NRA Shooting Illustrated.com (Nov. 29, 2020) ........................................................................ 26

Joel Penkala, *The Barrel Proofing Process*, Shotgun Craftsmanship, Upland Gun Company (March 2, 2021) ............................................................... 26

Joseph von Benedikt, *Raven Arms MP-25*, The Shooting Times Online (March 5, 2021) ........................................................................... 5

National Archives, Milestone Documents, Bill of Rights ................................ 2

Nicholas Freudenberg, *Lethal But Legal: Corporations, Consumption, and Protecting Public Health* (Oxford University Press, USA 2014) ...................................... 5

NRA Museum, Proof Mark registry ..................................................... 26

Peter Harry Brown, Daniel G. Abel, *Outgunned: Up Against the NRA: The First Complete Insider Account of the Battle Over Gun Control* (New York: Simon and Schuster, 2010) ........................................................................ 5

The Proof House, Worshipful Company of Gunmakers ................................. 26

Providence R.I. Gunpowder Ordinance, Secs. 1 – 4 (1821) ........................... 25

Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, Vol. 4 No. 5, Harvard Law Review 193-220 (1890) ................................................. 10

Wikipedia Commons, United States 1791-09-1792-03.png map ...................... 15

## ISSUE FOR REVIEW[1]

Whether the district court correctly held that the federal prohibition on possessing a firearm with an obliterated serial number, 18 U.S.C. § 922(k), facially violates the Second Amendment under *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022) – such that the decision below should be affirmed.

## SUMMARY OF ARGUMENT

The district court correctly found that possession of an unserialized firearm is conduct protected by the Second Amendment's plain text, and that Section 922(k) infringes on that conduct. The Second Amendment's plain text protects keeping and bearing arms in case of confrontation. Price possessed a handgun, which is not a "dangerous or unusual weapon" and which is the quintessential self-defense weapon used in the United States. The absence of a serial number does not remove Price's handgun from the Second Amendment's plain text. Possession of a unserialized firearm is not inherently unlawful (as evidenced by the fact a pre-1968 made unserialized handgun *is* lawful), and Section 922(k) infringes upon conduct protected by the Second Amendment. Section 922(k) is not consistent with this Nation's history of firearm regulation at the time of the Founding, thus *Bruen*'s presumption of unconstitutionality is not rebutted. The historical statutes cited by the United States are not relevantly

---

[1] Per Rule 28(b) of the Federal Rules of Appellate Procedure, Price is not "dissatisfied" with either the Government's jurisdictional statement or statement of the case and adopts them for purposes of this brief.

1

similar – much less distinctly similar – in terms of the comparable burdens placed on protected Second Amendment conduct, or comparable justifications. None of the authorities relied upon by the United States constitute *well-established and representative* historical firearm regulations which would make Section 922(k) constitutional under the Second Amendment. Finally, Price's being separately prohibited from possessing a firearm as a convicted felon does not constitute any lawful application of Section 922(k) that would bar a facial challenge. The district court did not err finding Section 922(k) facially unconstitutional, and its decision should be affirmed.

## ARGUMENT

The Second Amendment was ratified December 15, 1791.[2] Every existing federal firearm regulation was subsequently enacted during the Twentieth Century or later. Generally, those surviving constitutional challenges, at least before *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022), have been sustained through rational basis review subject to the unconstitutional collectivist interpretation of the Second Amendment,[3] *or* post *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), through intermediate scrutiny review subject to the individual rights interpretation of

---

[2]    *See e.g.* U.S. Const., amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, n.4 (2nd Cir. 1972); National Archives, Milestone Documents, Bill of Rights, https://www.archives.gov/milestone-documents/bill-of-rights.

[3]    *See e.g. United States v. Johnson*, 497 F.3d 548, 550 (4th Cir. 1974).

2

the Second Amendment.[4]  By dispensing with means-ends scrutiny, *Bruen* has refined *Heller* to the point all modern federal firearm regulations are now subject to reexamination under the Second Amendment, using *Bruen*'s plain text and history standard.

*Bruen* says when the Second Amendment's plain text covers an individual's conduct – the Constitution presumptively protects that conduct. To justify any regulation, the Government must demonstrate that it is consistent with this Nation's historical tradition of firearm regulation. Only if this showing is made, may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command".  *Bruen*, 142 S. Ct. at 2126.

This case is *not* about whether the Second Amendment, post-*Bruen,* still "allows a 'variety' of gun regulations." *See* U.S. Brief at 12, citing *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). It does. Rather, this case is solely about whether Section 922(k), post-*Bruen,* violates the Second Amendment. The district court did *not* err finding Section 922(k) facially unconstitutional under the Second Amendment. JA 97-111. Affirming that ruling will not mean the Second Amendment is "unlimited," any more than *Heller*, or *Bruen* have made it unlimited.

---

[4]  *See e.g. United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

I.   **The district court correctly found that possession of an unserialized firearm is conduct protected by the Second Amendment's plain text – such that the presumption of unconstitutionality applied to Section 922(k) under *Bruen*'s first prong.**

A.   **Standard of Review**

Under Fed. R. Crim. P. 12, district courts should dismiss criminal charges where there is an infirmity of law in the prosecution – such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). This Court's review of the district court's finding Section 922(k) facially unconstitutional is *de novo. See United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, * 3(5th Cir. 2023); *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999).

B.   **The specific "conduct" protected by the Second Amendment's plain text is to keep and bear arms in case of confrontation.**

While the "plain text" of the Second Amendment is squarely before the Court as part of *Bruen's* first prong, *Bruen*, 142 U.S. at 2126-2129, 2131, it is not even recited by the United States' brief. Consisting of twenty-seven now familiar words, the Second Amendment provides: "A well regulated Militia, being necessary to the security of the free State, the right of the people *to keep and bear arms*, shall not be infringed." U.S. Const. amend II (1791)(emphasis added).

Through the operative clause, the textual substance of the individual right protected by the Second Amendment is "to keep and bear arms in case of confrontation." *See Heller*, 554 U.S. at 581, 591; *Bruen*, 142 S. Ct. at 2127. Put another

4

way, while the United States tries very hard to redefine the actual protected *conduct*, *see* U.S. Brief, at 8, 15-20, keeping and bearing arms is still what is protected by the Second Amendment's plain text. *Heller* acknowledged Second Amendment protection of this *conduct* inside the home, *Heller*, 554 U.S. at 635; *Bruen* acknowledged Second Amendment protection of this *conduct* outside the home. *Bruen*, 142 S. Ct. at 2122. Textually, *Heller* defined bearable arms as "weapons" generally, not just those which were serialized or which bore other specific characteristics. *See Heller,* 554 U.S. at 581-592.

Engaging in a straightforward application of *Bruen*, the district court correctly found that Section 922(k) burdens conduct protected by the Second Amendment's plain text: the keeping and bearing of arms for purposes of self-defense. JA100-103.

### C.    Price possessed a handgun, which was a firearm in common use at the time.

The firearm seized from Price's car was a .25 caliber, semi-automatic handgun (Raven Arms MP-25).[5]  It was not a dangerous or unusual weapon, and it remains in common use not just in West Virginia, but throughout the United States. *Heller* itself acknowledged that handguns are "an entire class of 'arms'" overwhelmingly chosen by

---

[5]  The MP-25 was lawfully produced in the United States from 1970 to 1999, in response to the 1968 Gun Control Act's ban on inexpensive imported handguns.  See generally Joseph von Benedikt, *Raven Arms MP-25*, The Shooting Times Online (March 5, 2021), https://www.shootingtimes.com/editorial/raven-arms-mp25/389100 (last viewed Feb. 5, 2023);  Peter Harry Brown, Daniel G. Abel, *Outgunned: Up Against the NRA: The First Complete Insider Account of the Battle Over Gun Control*, pp. 57, 157 (New York: Simon and Schuster, 2010); Nicholas Freudenberg, *Lethal But Legal: Corporations, Consumption, and Protecting Public Health*, pp. 48–52 (Oxford University Press, USA 2014).

American society for the inherent individual right of self-defense; that the American people consider the handgun to be the quintessential self-defense weapon; and that handguns are the most popular weapon chosen by Americans for self-defense in the home. *See Heller*, 554 U.S. at 628, 629. *McDonald v. City of Chicago*, 561 U.S. 742, 767-68, 130 S. Ct. 3020, 3036 (2010), repeated those points. So did *Bruen*. *Bruen*, 142 S. Ct., at 2128. During 2022, handguns were still the most commonly owned firearm in the United States.[6]

### D. The absence of a serial number does not remove Price's handgun from the Second Amendment's plain text.

The Second Amendment's plain text makes no distinction between possession of serialized or unserialized firearms, any more than it distinguishes between unspecified subsets of "the people." *Heller*, 554 U.S. at 579-581. The Government, however, maintains that possession of an unserialized firearm does not fall within the Second Amendment's text for two reasons: (1) such firearms are not typically possessed by law-abiding citizens for lawful purposes, and (2) Section 922(k) does not "infringe" on the right to armed self-defense. Neither argument is persuasive.

---

[6] American Gun Facts, *How Many Guns are in the US?* (updated January 16, 2023), https://americangunfacts.com/gun-ownership-statistics/ (last viewed January 30, 2023).

**1. Unserialized firearms are *not* dangerous or unusual weapons, or possessed by law abiding citizens for unlawful purposes.**

Contrary to the United States' assertions, *see* U.S. Brief at 10, 15-20, possession of an unserialized firearm is covered by the Second Amendment's plain text. To begin, the test the Government uses to exclude certain firearms – "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625 – derives not from the Second Amendment's text, but from historical tradition. *Heller* said that limitation "accords with the historical understanding of the scope of the right." *Ibid.* And it said that the related "in common use at the time" limitation, which similarly derived from *United States v. Miller,* 307 U.S. 174 (1939), "is fairly supported by the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627 (emphasis added); *accord Bruen,* 142 S. Ct. at 2128 (prefacing discussion of the "in common use at the time" standard, by noting "[a]fter holding that the Second Amendment protected an individual right of armed self-defense, [*Heller*] also relied on the *historical understanding* of the Amendment to demark the limits on the exercise of that right"); *Id.* at 2132 ("[W]e use history to determine which modern "arms' are protected by the Second Amendment.").

The result is that the "common use" and "lawful purposes" limitations have no role to play at *Bruen*'s first prong. Rather, they are only relevant at *Bruen's* step two, where the Government bears the burden of establishing a robust, historical tradition of

distinctly similar firearm regulation consistent with Section 922(k) in order to overcome the initial presumption of unconstitutionality. *See Bruen,* 142 S. Ct. at 2126.

But even assuming *Bruen's* step one were to involve an inquiry into "common use" and use for "lawful purposes," the Government recites only half the relevant test. The "common use" standard is inextricably tied up in the permissibility of limitations on "dangerous and unusual weapons"; they operate as different sides of the same coin. As explained above, *Heller* described the "in common use at the time" requirement as being "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller,* 554 U.S. at 627. In other words, "in common use for lawful purposes" and "dangerous and unusual" are two ways of asking the same question. A weapon is protected by the Second Amendment as long as it either (1) is in common use for lawful purposes, or (2) is not "dangerous and unusual."

Here, the Government has not shown that unserialized firearms can be excluded on either basis. Dangerousness has to do with a firearm's functionality – i.e. whether it makes a gun shoot faster, causes bullets to hit with greater impact, increases the firearm's magazine capacity, or otherwise renders a firearm more deadly. The lack of a serial number does none of those things. As the district court correctly noted – lack of serialization does not affect the functionality of a given firearm, nor does it render any firearm a "dangerous and unusual weapon" that is outside the scope of Second Amendment protections. JA109-110. The United States has conceded as much. *See*

U.S. Brief, at 18, 26. Thus the Government cannot classify unserialized firearms as "dangerous" and unusual.

Nor has the Government established that unserialized firearms are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. The Government asserts that "the only reason to *obliterate* a serial number is to avoid being connected with a firearm that was stolen, involved in a crime or obtained in a straw purchase." U.S. Brief at 18 (emphasis added). But an individual does not have to remove, obliterate, or alter a firearm's serial number in order to be criminally culpable under Section 922(k);[7] they only have to *possess* the gun. Here there is no suggestion, much less evidence, that Price did anything other than *possess* an unserialized firearm.

And it is simply not true, as the Government maintains, that unserialized firearms are never possessed by law abiding citizens for lawful purposes or that the only reason to possess an unserialized firearm is to evade law enforcement detection. *See* U.S. Brief, at 1, 8, 15-20. A private citizen might possess an unserialized firearm because they received it as a gift, because they legally bought it from a non-licensed dealer, because the serial number wore away, or for any other number of innocuous reasons. Possessing an unserialized firearm is not inherently unlawful or inherently nefarious, and is a

---

[7]  In fact, a serial number does not even have to be illegible to fall under Section 922(k). *See United States v. Harris*, 720 F.3d 499, 502-503 (4th Cir. 2013).

perfectly legitimate exercise of the fundamental right to keep and bear arms.[8] Indeed, as the United States itself concedes, Section 922(k) recognizes the innocence of such conduct – by permitting the possession of an unserialized firearm manufactured before 1968. *See* U.S. Brief, at 18.

The Court should not accept the Government's naked, unsupported assertion that law-abiding citizens do not possess unserialized firearms for lawful purposes. After *Bruen*, the Government can no longer establish a firearm regulation's constitutionality by speculation.

### 2. Section 922(k) infringes on the right to keep and bear arms.

The United States repeatedly claims that Section 922(k) does not meaningfully burden Second Amendment conduct because serialization does not affect firearm functionality, marked firearms are ubiquitous, and individual self-defense may still be exercised using serialized or pre-1968 made unserialized firearms. *See* U.S. Brief at 18-20, 26. This is not true. Section 922(k) expressly prohibits possession of a firearm. To any individual possessing a post-1968 unserialized firearm, they are subject to federal felony criminal jeopardy under Section 922(k) unless they forfeit their constitutional

---

[8] Beyond the valid examples already discussed by the district court (which are hardly "fanciful", *see* U.S. Brief, at 20), a private citizen's possessing an unserialized firearm is also an equally legitimate exercise of what Justice Brandeis characterized as "the right to be left alone." *See* Sanuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, Vol. 4 No.5, Harvard Law Review 193-220 (1890); *Olmstead v. United States*, 227 U.S. 438, 471-488 (1928)(Brandeis, J. dissenting).

right to self-defense. Otherwise, if convicted - besides being subject to five years in a federal prison - that person could become permanently stripped of their right to possess firearms. 18 U.S.C § 922(g)(1).[9] So the burden of Section 922(k) on possessing an unserialized firearm is both heavy and real. This is disproportionate and unreasonable – where serialization does not impact firearm functionality, safety, or dangerousness, and Section 922(k)'s burden can supposedly be alleviated by just possessing either a serialized or another *pre*-1968 unserialized firearm (assuming a given citizen is even capable of discerning the difference).

More importantly, the Government's no-infringement argument completely misses that the Government cannot infringe upon a constitutional right in one way just because it doesn't violate it in other ways. *Heller* made this point discussing the District of Columbia's ban on handguns in the home: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller,* 554 U.S., at 629. Justice Thomas (joined by Justice Scalia) made a similar point when dissenting from denial of *certiorari* in a case that banned "assault weapons":

> Lastly, the Seventh Circuit considered 'whether law abiding citizens retain adequate means of self-defense,' and reasoned that the City's ban was permissible because '[i]f criminals can find substitutes for banned assault weapons, then so can law abiding homeowners.' … That analysis misreads *Heller.* The question

---

[9] The district court was incorrect in its determination that § 922(g)(1) survives scrutiny under *Bruen,* JA 111-116, but that issue is not yet before this Court in this case.

under *Heller* is not whether citizens have adequate alternatives available for self-defense. Rather, *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose … regardless of whether alternatives exist.

*See Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447, 448 (2015) (Thomas, J. dissenting from denial of *certiorari*). The court in *United States v. Kelly*, 2022 WL 17336578 (M.D.Tenn. 2022) made a similar point:

> The Government points out that a bar on receiving a new firearm [under 18 U.S.C. § 922(n)] is not a total ban on weapons possession, but neither was the law found to be unconstitutional in *Bruen*. Generally speaking, moreover, the infringement on a constitutional right in one way is not typically negated by the fact that the Government did not violate the same right even further in another way.

Separately, or more accurately *cumulatively* – deciding whether a law violates the Second Amendment based on how great a burden it imposes does exactly what *Bruen* prohibited in the context of the "relevantly similar" analysis – returning to independent means-ends balancing under the guise of analogical reasoning. *Bruen,* 142 S. Ct. 2133, n.7.

Consistent with this prohibition, what the United States' entire argument misses is that post-*Bruen*, courts do not ask about the *size* of the burden placed on protected conduct. *Any* burden is impermissible, unless the United States conclusively proves it is consistent with a robust historical tradition of firearm regulation at the time of the Founding. As one court observed, "*Bruen* does not allow the Court to balance the extent of an intrusion into a Second Amendment right against the strength of the public interest served by" the challenged regulation "or the closeness of the means to the statute and the end." *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175, at *

14, n.28 (D.R.I. 2022). That is because a court "cannot . . .conclude that the impairment is 'modest' and 'the fit between [legislative] interests and restrictions imposed by the Act is both close and reasonable',", rather, "*any* intrusion into a right protected by the Second Amendment thrusts us into the territory of justifying the regulation as one historically placed on similar weapons." *Ibid.* (emphasis added)).  The Government's claim that 922(k) does not infringe on protected Second Amendment conduct is without merit.

### E.    The district court's straightforward application of *Bruen*'s first prong should be affirmed.

The district court correctly found that Section 922(k) was not a commercial regulation, that it directly infringed upon firearm possession, and that the conduct prohibited by Section 922(k) "falls squarely within the Second Amendment's plain text". JA101-103.   Under *Bruen*'s first prong, the district court further found that Section 922(k) was presumptively unconstitutional.  JA103. These findings should be affirmed.

## II.    The district court correctly found Section 922(k) is not consistent with any distinctly similar historical tradition of firearm regulation at the time of the Founding.

### A.    Standard of Review

This Court's review of the district court's finding Section 922(k) facially unconstitutional is *de novo. See United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240,

* 3 (5th Cir. 2023); *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999).

> **B.    "At the time of the Founding" directs *Bruen*'s historical inquiry for federal firearm regulations.**

In the context of historical federal firearm regulations, *Bruen*'s second prong focuses on how Second Amendment protections were burdened or otherwise limited "at the time of the Founding." This is because "constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen,* 142 S. Ct. at 2136.

In *United States v. Cruikshank*, 92 U.S. 542 (1875), the Supreme Court acknowledged that the rights protected by the Second Amendment were "not granted by the Constitution [or] in any manner dependent upon that instrument for its existence. The second amendment … means no more than that it shall not be infringed by Congress." *Heller* repeatedly reaffirmed this position, and – in assessing the constitutionality of a federal firearm regulation – looked to 1791, not 1868. *See Heller,* 554 U.S. at 592, 619-20. *Bruen* similarly says the Court has "generally assumed that the scope of the protection applicable to the Federal Government and the States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen,* 142 S.Ct. at 2137. Because *Bruen* expressly said it "need not address" whether 1791 or 1868 provides the proper historical baseline, that opinion provides no basis for deviating from the Supreme Court's normal "assum[ption]." *Bruen,* 142 S. Ct. at 2138.

14

Consistent with *Heller*, "*Bruen* is clear that the Second Amendment 'codified a right inherited from our English ancestors," a right that '*pre-existed*' the Constitution. *Bruen,* 142 S. Ct., 2130, 2139. The entire universe of permissible firearm regulations, then, was set at the adoption of the Bill of Rights, if not earlier." *United States v. Love*, 2022 WL 17829438, at *4 (N.D. Ind. 2022).

The emphasis on the time the Constitution and Second Amendment were ratified is the foundation of *Bruen*'s "text and history" standard. What made up the United States – i.e. what sovereign states geographically made up our country; and therefore what jurisdictions' laws should be consulted for historical restrictions on Second Amendment protections, is defined by "at the time of the Founding."  The United States' Constitution was signed on September 17, 1787, then ratified by nine of the thirteen state legislatures between December 7, 1787, and June 22, 1788. The Confederation Congress began operating under the new Constitution on March 9, 1789. The Bill of Rights were later ratified on December 15, 1791. So the "time of the Founding" essentially consists of mid-1787 to the end of 1791.  Geographically, by the end of 1791, our physical country consisted of thirteen sovereign states, and two territories on the north and south sides of Virginia:[10]

---

[10]  Wikipedia Commons, United States 1791-09-1792-03.png map, https://upload.wikimedia.org/wikipedia/commons/4/43/United_States_1791-09-1792-03.png.



States and Territories of the United States of America
September 9 1791 to March 3 1792

Given the composition of our country "at the time of the Founding," post-*Bruen* courts should look to the particular history of laws and traditions followed by the first thirteen states between mid-1787 and the end of 1791. This would be the strongest evidence of any distinctly similar historical tradition of firearms regulation consistent with the Second Amendment, particularly with respect to societal problems which existed in 1791.

C.    *Bruen*'s **"distinctly similar" and "relevantly similar"**
**inquiries are alternative analogical tools.** *Bruen*'s
**"relevantly similar" inquiry is only available under**
**limited circumstances, and is not a supplemental "do**
**over" for regulations failing** *Bruen*'s **"distinctly similar"**
**standard**.

*Bruen* sets out two different inquiries for determining whether a challenged regulation is consistent with our Nation's historical tradition of firearm regulation. Which inquiry applies depends on what kind of problem a statute targets and whether it is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Bruen,* 142 S. Ct. at 2131. For such statutes, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Ibid.* (emphasis added). If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Ibid.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Ibid.* Both *Heller* and *Bruen* fell in this first category: the laws challenged in those cases were aimed at a problem – "handgun

17

violence, primarily in urban areas" – that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Ibid.[11]*

Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S.Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Ibid*. Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar*." *Ibid*. (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—what the Court called the "how" and the "why." *Id*. at 2133 (emphasis omitted).

This "relevantly similar" inquiry – which the Court did not undertake in *Bruen* – is less onerous. Unlike the "distinctly similar" standard, it may be satisfied even if the Government does not identify "a historical *twin*" or "a dead ringer" for a modern

---

[11]   *United States v Holton*, ___ F.Supp.3d ___, 2022 WL 16701935,*2  (N.D. Tex. 2022) does not even acknowledge this inquiry under *Bruen*'s second prong – and like the United States – goes straight to the "relevantly similar" inquiry.  *United States v. Tita*, 2022 WL 17850250, at *5 (D. Md. 2022), follows suit.

firearm regulation. *Bruen,* 142 S.Ct. at 2133.[12]  But courts may employ the "relevantly similar" approach only when the challenged statute is geared toward a societal problem that would have been "unimaginable at the founding." *Id.* at 2132. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132; *see United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023)("[T]he court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for assessment of the Government's proffered historical analogues, depending on whether the 'challenged regulation addresses a general societal problem that has persisted since the 18th century,' or whether the statute addresses 'unprecedented societal concerns or dramatic technological changes'," *quoting Bruen*, 142  142 S. Ct. at 2131-32.

*Bruen's* historical second prong is not linear, or multi-tiered. If a distinctly similar historical analogue does not exist regarding a societal problem which existed at the Founding, the challenged regulation is unconstitutional. That is the end of the inquiry. The Government is not permitted a less demanding "do-over" to explore whether there

---

[12]  Even when on the "relevantly similar" track, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Ibid.*

might be an alternately "relevantly similar" historical analogue. The distinctly similar and relevantly similar inquiries operate as alternatives: one applies to statutes aimed at *old* problems, the other applies to statutes aimed at *new* problems. The relevantly similar inquiry is not a supplemental approach the Court may turn to if the distinctly similar analysis does not work out. *See Bruen,* 142 S. Ct., at 2131-2134.

> **D.** **The societal problems addressed by Section 922(k) existed at the time of the Founding, and were neither "unprecedented", "unimaginable at the founding," or based on any "dramatic technological changes."**

The societal problems Congress sought to address through Section 922(k) were firearm violence and solving firearm crimes. *See* U.S. Brief, at 27. As the district court correctly surmised, these problems existed in 1791, and certainly were not "unprecedented" or "unimaginable at the founding." JA108-109. The United States dismisses the absence of distinctly similar historical analogues as being "non-probative" of legislative priorities, U.S. Brief at 28 & 31; suggests that gun violence did not "preoccupy the Founders", *Id.*, at 29 (with no supporting evidence); asserts that Section 922(k) is based in part on technological changes (again citing no specific evidence), *Ibid*; and that due to manufacturing technology at the time of the founding – firearm serialization would have been unrealistic. But the United States still manages to acknowledge that "the Founders themselves could have adopted" a statute like Section 922(k) to address firearm violence and the difficulty of solving firearm crimes. *Bruen,* 142 S. Ct. at 2131; *see* U.S. Brief, at 21-27. The United States concedes that stamping

technology existed both before and at the time of the founding, as evidenced by the practice of using barrel proofing stamps. Barrel proofing was done in England in the 1600's, and progressed at the rate of firearm manufacturing in existence at the time. Later mass production of firearms involved technologies that would have easily allowed corresponding mass firearm serialization to occur well before 1968. So, contrary to the Government's claim, the societal problem addressed by Section 922(k), does not grow out of post-founding "technological changes" and was not unimaginable at the founding. U.S. Brief at 28-30. Given the nature of the problems targeted by Section 922(k), the appropriate analogical inquiry was and should have been under *Bruen*'s (distinctly similar) standard, not the (relevantly similar) standard.

### E.   The district court did not misunderstand the analogical analysis to be applied under *Bruen*.

While the standard of review is *de novo*, *see* U.S. Brief, at 15, there should be no question the United States previously failed to put forward any of the evidence or arguments it now contends require the district court to be reversed. The United States was instead content to rest on the assertion Section 922(k) is a commercial firearm regulation not prohibited by the Second Amendment. Given the complete dearth of evidence before the district court regarding Section 922(k)'s consistency with any distinctly similar historical analogues at the time of the founding, it seems more than a stretch to claim the district court "misunderstood" the analogical inquiry required under *Bruen*, that it read too much into the absence of distinctly similar historical regulations

21

due to legislative silence, that it failed to understand gun violence did not preoccupy the Founders, and that it incorrectly interpreted history in finding Section 922(k) unconstitutional. "QED". *Heller*, 554 U.S. at 634.

Of course, the United States' failure to carry its burden before the district court should not be the only reason the decision below is affirmed. The completely new arguments and materials advanced on appeal likewise fail to establish a distinctly similar historical tradition of firearm regulation which would overcome *Bruen*'s presumption that Section 922(k) is unconstitutional.

### F. Section 922(k) is not consistent with any distinctly similar firearm regulation that existed at the time of the Founding.

The Government's historical arguments conflate the "distinctly similar" and "relevantly similar" inquiries as if they were one, and completely miss (perhaps deliberately) that resort to the more elastic "relevantly similar" historical analysis is not available just because a regulation has no historical analogues under *Bruen*'s "distinctly similar" analysis. The United States mischaracterizes *Bruen* as going straight to the "relevantly similar" approach as a matter of course – which it does not. Yet this is precisely what the United States is asking this Court to do; the Court should decline the invitation.

The Government also dismissively characterizes legislative inaction at the time of the founding as "less probative" than "a state's considering the law and rejecting it on constitutional grounds." U.S. Brief at 28. But *Bruen* says no such thing, and it

certainly does not suggest the Government can rebut the presumption of unconstitutionality simply by showing that no founding-era court ever struck down a similar regulation. *See Bruen,* 142 S. Ct. at 2131. In fact, the absence of any such judicial determinations from the founding era is particularly irrelevant where, as here, founding-era legislatures never enacted any laws like Section 922(k). Eighteenth and early nineteenth-century courts could not express a view on the constitutionality of a regulation they never confronted.

In any event, "legislative silence" is actually central to *Bruen*'s historical inquiry. *Bruen* explained that a statute is unconstitutional unless it comports with "the Nation's historical tradition of firearm *regulation.*" *Bruen,* 142 S. Ct. at 2130 (emphasis added). The Court's analysis in *Bruen* turned almost entirely on the fact that no jurisdiction had ever "regulated" public carry – i.e., proscribed it through legislative enactments – in a manner similar to New York's proper-cause requirement. *Id.* at 2142. Time and again, the Court asked whether "regulations" like New York's existed in the founding era. *See, e.g., Id.* at 2135, 2139, 2142, 2150. The fact that they did not was essential to the Court's holding.

Neither the record nor the United States' historical proxies (including those separately cited by the Government purportedly banning sales of firearms at certain geographic locations and to certain categories of people, *see* U.S. Brief, 21-22), establish any distinctly similar historical firearm regulations which are consistent with Section 922(k). The district court found as much, and this Court should concur.

**G.  Section 922(k) is also not consistent with any other "relevantly similar" historical firearm regulation that existed between 1791 and 1821.**

Even if the improper "relevantly similar" inquiry were to apply, the Government has not borne the burden of establishing any robust tradition of laws relevantly similar to Section 922(k) – i.e., laws that are comparably justified and which impose a comparable burden on the right of armed self-defense.

In support of reversing the district court's ruling, the United States points to a handful of colonial, pre-constitution, and post-1805 commercial gunpowder and gun barrel statutes as being "relevantly similar" historical analogues to Section 922(k).  First, the United States cites six gunpowder regulatory schemes enacted by the Massachusetts Colony, the Connecticut Colony, Pennsylvania, New Hampshire, Massachusetts, and the City of Providence, Rhode Island, over the 170 year period between 1651 and 1821. *See* U.S. Brief, at 22-24.

Rather than requiring marking and serialization procedures to aid in solving crimes or keeping gunpowder away from "dangerous people", the cited gunpowder laws regulated commerce as a matter of consumer and product safety. Thus these laws were not "comparably justified" relative to § 922(k), which is meant to reduce the use of firearms for unlawful purposes and aid in solving crimes. *Bruen*, 142 S. Ct. at 2133.

Specifically, these laws typically authorized the appointment of an inspector of gunpowder for every public powder magazine and "at every manufactory" of gunpowder in a given jurisdiction; regulated the composition of gunpowder

manufactured within a given jurisdiction; specified what characteristics rendered powder to be "in proof" – meaning of conforming composition, safely storable and safely salable – which had to be certified by an inspection mark, date, and quantity; directed inspectors to mark as "condemned" all non-conforming "ill manufactured, or deficient gunpowder"; prohibited the sale of *deficient* powder and fraudulent removal of "condemned" labels; limited the quantities of gunpowder which could be possessed or stored in a given location; and generally required licenses to sell or otherwise transfer gunpowder within certain jurisdictions. The penalties for violating any of these statutes did not result in firearm disarmament or imprisonment, and instead typically resulted in a nominal forfeiture of non-conforming gunpowder and in the imposition of various fines – some as low as $ 5. *Cf. Id.* at 2149 ("And given that surety laws were 'intended merely for prevention' and were 'not meant as any degree of punishment,' 4 Blackstone, Commentaries, at 249, the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on New York's proper-cause standard – a violation of which can carry a 4-year prison term or a $5,000 fine."). Individuals on federal or state military duty "in the public service" were exempted by at least one jurisdiction. *See* Providence R.I. Gunpowder Ordinance, Secs. 1 – 4 (1821).

The United States separately maintains that two "barrel proofing statutes" enacted by Maine and Massachusetts over fourteen years after the Founding – between March 8, 1805, and March 10, 1821 – demonstrate a historical tradition of firearm regulation which would support the constitutionality of Section 922(k). *See* US Brief at

25

24-25.  In order to understand why the referenced barrel proofing laws plainly do not do so, it is important to understand what barrel proofing does and what it is for.

"Barrel proofing" was a type of musket and pistol barrel-function testing, where appropriate sized ammunition was overloaded with powder in the gun on purpose.[13] Discharging the gun with the overloaded powder produced higher than normal pressures inside the barrel.  If the barrel as constructed could withstand the increased pressures from the overloaded discharge, it was expected to withstand the significantly lower pressures of non-overloaded discharges that occurred with regular use. Proofing barrels either worked, or failed. For those that worked and passed the "proofing" process, the barrels were affixed with a stamp as notice to anyone using the gun about the identity of who proofed the barrel and that it had been safely proofed to work as intended. Barrel proofing started being used by English gunsmiths during the 1630s.[14] The United States historically had no formal proofing houses (like European countries), so most U.S. manufacturers today voluntarily proof their own firearms.[15]

---

[13]  *See* Joel Penkala, *the Barrel Proofing Process*, Shotgun Craftsmanship, Upland Gun Company (March 2, 2021), https://uplandguncompany.com/the-barrel-proofing-process/ (last viewed Feb. 2 2023);  George Harris, *What Does It Mean to Proof a Firearm?*, NRA Shooting Illustrated.com (Nov. 29, 2020), https://www.shootingillustrated.com/content/what-does-it-mean-to-proof-a-firearm/ (last viewed Feb. 3, 2023).

[14]  *See e.g.* The Proof House, Worshipful Company of Gunmakers, https://www.gunmakers.org.uk/the-proof-house/ (last viewed Feb. 1, 2023).

[15]  *See* NRA Museum, Proof Mark registry, https://www.nramuseum.org/media/940944/proofmarks.pdf (last viewed Feb. 3, 2023).

Barrel proofing and barrel proofing marks, in other words, were also consumer product safety measures, expressly adopted to protect firearm end-users and to improve firearm safety. Such effectively operated as the "do not remove" mattress tags of early Nineteenth Century firearm manufacturing. As a result, barrel proofing statutes were not "comparably justified" with Section 922(k), which is intended to facilitate crime-solving. *Bruen*, 142 S. Ct. at 2133. Barrel proofing statutes, therefore, are not "relevantly similar" – much less "distinctly similar" – to Section 922(k)'s prohibition against possessing an unserialized firearm. Using either *Bruen* inquiry, there is no fit – much less a tight fit – between Section 922(k) and the collection of statutes presented by the United States.

Finally, the United States makes general reference to largely seventeenth-century *colonial* commercial statutes regulating "the firearms trade" by location and jurisdiction, and for six *colonies* – prohibiting the sale of firearms to Native Americans. *See* U.S. Brief, at 21-22. The United States contends "these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands." *Id* at 22. The cited text and statutes, do not necessarily support that general assertion, and it defines the stated purpose much too broadly. The United States further offers no actual evidence of such purposes. Assuming that is what they were, however, as with the gunpowder and two 1820 barrel proofing stamp statutes – such purposes still do not share sufficiently comparable burdens or justifications with Section 922(k).

27

More important than any similarity of fit (which again really looks, smells, and kind of tastes more like means-end interest balancing than any true examination of history), is the scope of the *tradition represented* by the gun barrel stamp and gun powder statutes cited by the United States under the relevantly similar inquiry. *See Bruen,* 142 S. Ct., at 2133. While the United States is correct that *Bruen* does not require a historical *twin*, a historical analogue must still be "*well-established and representative*". *Ibid.* (emphasis added). None of the statutes presented by the United States fit that bill.

Even assuming the existence of comparable burdens and comparable justifications, the regulations cited by the Government are not "representative" of the United States. The gunpowder regulations consist of laws from two colonies, three states (one of which was one of the previous colonies), and a single city; the barrel proofing statutes come from only two states (again including one of the same with commercial gunpowder regulations). Whether considered separately or collectively, these "outlier" statutes do not demonstrate a robust historical tradition of anything – much less any comparable historical tradition of firearm regulation infringing on protected Second Amendment conduct. *Bruen*, 142 S. Ct. at 2156. The *Bruen* Court said it "doubt[ed] that *three* colonial regulations could suffice to show a [historical] tradition." *Id.* at 2143. By that measure, the Government's statutes come up well short. In 1791, this country consisted of thirteen states. By 1821 it had increased to twenty-three. Three out of thirteen states regulating gunpowder, and two out of twenty-three requiring barrel proof stamps, simply do not – under any metric – establish a "well-represented

and representative" historical tradition of firearm regulation placing Section 922(k) outside the Second Amendment's "unqualified command". *See Spencer v. Nigrelli*, 2022 WL 17985966, at *12 (W.D.N.Y. 2022) (holding "a handful of . . . enactments involving a small minority of jurisdictions governing a small minority of population" are insufficient to establish a tradition under *Bruen*).

As was the case with *Heller* – *Bruen*'s analysis of Section 922(k) should be "fairly straightforward". *Bruen,* 142 S. Ct. at 2131. With the district court it was. The district court's application of *Bruen*'s historical analysis, and finding that Section 922(k) is unconstitutional were correct. Both should be affirmed.

### III. The district court did not err finding Section 922(k) facially unconstitutional. Section 922(k) is not constitutional as applied to Price simply because he is a convicted felon and thereby prohibited from firearm possession through application of another statute.

#### A.     Standard of Review

This Court's review of the district court's finding Section 922(k) facially unconstitutional is *de novo. See United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, * 3 (5th Cir. 2023); *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999)

#### B.     Section 922(k) is facially unconstitutional.

The district court did not err concluding Section 922(k) is facially unconstitutional. As a parting shot, the Government argues the district court improperly applied the facial standard from United *States v. Salerno*, 481 U.S. 739 (1987),

because Section 922(k) would not violate the Second Amendment where Price is also a convicted felon.  On this basis, the Government maintains that Section 922(k) would not be unconstitutional in all its applications.

A facial challenge requires showing "that the law is unconstitutional in all of its applications." *Salerno*, 481 U.S. at 745.[16]  The key word is "applications". Courts only consider "applications of the [challenged] statute in which it actually authorizes or prohibits conduct," not circumstances for which the statute is irrelevant. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415-19 (2015).

The Government's argument does not raise actual applications of Section 922(k). Rather, it maintains that the application of Section 922(g)(1) to Price would not be protected by the Second Amendment, and through it Section 922(k) would still be constitutional. The situation described does not involve application of Section 922(k) at all, but only Section 922(g)(1). In the Government's telling, Price can be disarmed because of a status covered by a statute *other than* Section 922(k). That fact has no relevance to whether Section 922(k) is constitutional.

The Supreme Court rejected a similar argument in *Patel*.  That case involved a facial Fourth Amendment challenge to a municipal code provision that authorized warrantless searches of certain hotel records.  *Patel,* 576 U.S. at 412-13.  The city

---

[16]  Courts have not strictly adhered to the *Salerno* standard. For example, in the unconstitutional vagueness context, the Supreme Court has recognized that a statute need not be vague in every application to be facially struck down. *See Johnson v. United States*, 576 U.S. 591, 602 (2015).

responded that a facial challenge "must fail because such searches will never be unconstitutional in all applications." *Id.* at 417. It argued that searches covered by the statute would be constitutional in certain circumstances, such as emergency situations, where consent was given, or where the police had a warrant. *Id* at 417-18.

The Supreme Court explained that the city misunderstood "how courts analyze facial challenges." *Patel,* 576 U.S. at 418. The purportedly constitutional applications the city identified were "irrelevant" to [the Court's] analysis because they did not involve actual applications of the statute." *Id.* at 419. For those examples, the searches could occur without the challenged statute. *Ibid.* "Statutes authorizing warrantless searches … do not work where the subject of the search has consented." *Ibid.*

Here the Government argues that circumstances beyond the application of the statute would be constitutional, and thus bar a facial challenge. If a person is a convicted felon, the conduct of possessing a firearm could be charged under another statute. In that situation, Section 922(k) does "no work" to prohibit the conduct, so it is not an application of section 922(k). *See Patel*, 576 U.S. at 419. As in *Patel*, Price's status as a convicted felony would not permit prosecution under Section 922(k), but would render it *irrelevant. See Id.* at 418.

*Bruen* itself could not have been decided under the Government's facial standard. There too, a litigant could have argued that the New York licensing regime would not have violated the Second Amendment if the applicant wanted the license to obtain a "dangerous or unusual weapon" or wanted a firearm to help somebody escape from

prison. But these were not applications of the New York statute, so they were not relevant to a facial challenge to *that* statute. The Court found the statute facially unconstitutional. *See Bruen*, 142 S. Ct. 2111.

The Government's attempt to say Section 922(k) would still be constitutional because Price was a convicted felon is without merit. *See* U.S. Brief, at 31-33. Section 922(k) deals with possession of a firearm not having certain non-functional characteristics; Section 922(g)(1) categorically deals with who may possess a given firearm, irrespective of the gun having or not having certain non-functional characteristics. In the Second Amendment calculus, the two prohibitions are independent, completely different, and are not interchangeable. Even assuming Section 922(g)(1) is constitutional, that fact does not make the firearm characteristic prohibition constitutional at well because it is not an application of Section 922(k). So the Government's assertion that Section 922(k) would be constitutional in some other applications under *Bruen* is incorrect.

The Fifth Circuit's recent opinion in *United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023), demonstrates the Government's error. As *Rahimi* explains, "if a statute is inconsistent with the Second Amendment's text and historical understanding, *then it falls under any circumstances*." *Id.* at *4 (emphasis added). In other words, a statute either is consistent with America's tradition of firearm regulation, or it's not. If not, that's it. There is no supplemental examination of differences in application. *Bruen* does not allow for further consideration of anything else.

32

## CONCLUSION.

Price's possession of a handgun, the quintessential weapon of self-defense in modern America, falls squarely within the scope of the Second Amendment as explained in *Heller* and *Bruen*. Section 922(k), which criminalizes Price's mere possession of that firearm because it has an altered serial number, infringes upon that conduct that is protected by the Second Amendment. Such a regulation is not consistent with this Nation's history of firearm regulation at the time of the Founding. The alleged historical analogues cited by the Government are not sufficiently similar to Section 922(k) to justify its constitutionality. Therefore, for the reasons stated more fully above, the district court's finding that Section 922(k) is facially unconstitutional should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure, Price hereby requests oral argument. To counsel's knowledge, this Court has not yet addressed the impact of *Bruen* on Second Amendment caselaw, nor has it reviewed the validity of Section 922(k) in the wake of *Bruen*. Oral argument will greatly assist the Court in reaching its conclusion.

Respectfully submitted,

**RANDY PRICE**
By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**/s/ Lex A. Coleman**
Lex A. Coleman
Senior Litigator, AFPD
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: lex_coleman@fd.org

**/s/ Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: jonathan_byrne@fd.org

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*7,989*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Garamond*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  February 6, 2023                    /s/ Lex A. Coleman
                                            *Counsel for Appellant*

                                            /s/ Jonathan D. Byrne
                                            *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of February, 2023, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel as registered CM/ECF users.

/s/ Lex A. Coleman
*Counsel for Appellant*

/s/ Jonathan D. Byrne
*Counsel for Appellant*