No. 22-4609

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————————————

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

RANDY PRICE,
Defendant–Appellee.

———————————————

On Appeal from the United States District Court for the
Southern District of West Virginia, No. 2:22-cr-97
(Hon. Joseph R. Goodwin)

———————————————

**REPLY BRIEF FOR THE UNITED STATES**

———————————————

WILLIAM S. THOMPSON
United States Attorney

JENNIFER RADA HERRALD
Assistant United States Attorney
Southern District of West Virginia

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES .........................................................ii

INTRODUCTION ...................................................................... 1

ARGUMENT ............................................................................. 1

I.     The District Court Erred by Concluding That 18 U.S.C. § 922(k) Is Unconstitutional. .................................................................... 1

       A.    The Second Amendment's text does not protect possession of a firearm with an obliterated serial number. ........................... 2

       B.    Even if the Second Amendment protected such firearms, § 922(k) would not infringe on the right to self-defense. ............... 8

       C.    Section 922(k) is consistent with the Nation's tradition of firearm regulation. .................................................................... 11

              1.    Price incorrectly attempts to reframe the historical inquiry. ................................................... 13

              2.    Price fails to rebut the specific historical examples identified by the government. .................. 19

       D.    The district court erred by striking down § 922(k) as facially invalid. .................................................................... 26

CONCLUSION ....................................................................... 29

CERTIFICATE OF COMPLIANCE ......................................... 30

CERTIFICATE OF SERVICE ................................................. 31

# TABLE OF AUTHORITIES

## Cases

*Blodgett v. Holden*,
  275 U.S. 142 (1927) ................................................................... 1

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) ............................................................ 26

*City of Los Angeles, Cal. v. Patel*,
  576 U.S. 409 (2015) ...........................................................26, 27

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..........................................................*passim*

*Friedman v. City of Highland Park, Ill.*,
  136 S. Ct. 447 (2015) .............................................................. 10

*National Federation of Indep. Business v. Sebelius*,
  567 U.S. 519 (2012) ................................................................. 2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) .......................................................*passim*

*Pasquantino v. United States*,
  544 U.S. 349 (2005) ............................................................... 27

*United States v. Gavegnano*,
  305 Fed. App'x 954 (4th Cir. 2009) ....................................... 19

*United States v. Holton*,
  No. 3:21-cr-482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ........2, 8, 12

*United States v. Marzzarella*,
  614 F.3d 85 (3rd Cir. 2010), *abrogated on other grounds by New York
  State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...............3, 5, 6

*United States v. Miller*,
  307 U.S. 174 (1939) ................................................................. 4

*United States v. Rahimi*,
   59 F.4th 163 (5th Cir. 2023), *opinion withdrawn and substituted*, No.
   21-11001, Doc. 154-1 (Mar. 2, 2023) ..................................................... 28

*United States v. Reyna*,
   No. 3:21-cr-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ..... 2, 3, 8, 12

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................... 27, 29

*United States v. Serrano*,
   No. 3:21-cr-1590, 2023 WL 2297447 (S.D. Cal. Jan. 17, 2023) ......... 2, 8, 12

*United States v. Tita*,
   No. 1:21-cr-334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) .............. 2, 12

*United States v. Williams*,
   442 F.3d 1259 (10th Cir. 2006) ............................................................. 19

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) .............................................................................. 29

## Statutes and Constitutional Provisions

U.S. Const. amend. II ................................................................................. 2

18 U.S.C. § 922(k) .................................................................................... 6

Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789 ................... 6

Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250 ................... 6

## Historical Statutes

1 Archives of Maryland, Proceedings and Acts of the General
   Assembly of Maryland, January 1637/8 – September 1664 (1883) ........... 22

1 Laws of the State of New-Hampshire, with the Constitutions of the
   United States and of the State Prefixed (1815) ........................................ 25

1 Revised States of New Jersey 1937 (1937) ................................................. 7

1 Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619 (1823) ............ 20

2 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay (1874) ...................................................... 25

2 Consolidated Supplement to the Codes and General Laws of the State of California 2627 (1926), Act 1183, § 13 ........................... 7

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822 (1823) ...................................... 19

2 General Statutes of Connecticut: Revision of 1949 (1949) .......................... 7

2 Laws of the State of New-York (1802) ....................................................... 25

3 Compiled Laws of the State of Michigan (1929) ........................................ 7

4 Statutes at Large of South Carolina (1838) .............................................. 25

5 Records Of The Colony Of New Plymouth (1856) .................................... 20

6 Statutes at Large of Pennsylvania from 1682 to 1801 (1899) ................. 20, 22

8 Records of the State of Rhode Island and Providence Plantations in New England (1863) ................................................................... 25

8 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature (1821) ....................... 25

11 Statutes at Large of Pennsylvania (1906) ............................................. 25

18 Colonial Records of the State of Georgia (1910) ................................... 25

Acts and Laws of the English Colony of Rhode-Island and Providence-Plantations, in New-England, in America (1767) ................. 25

Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City (1835) ....................................... 20

Colonial Laws of Massachusetts. Reprinted from the Edition of 1660, with the Supplements to 1672[,] Containing Also, the Body of Liberties of 1641 (1889) .......................................................... 22

Digest of the Laws of Maryland, Being an Abridgment, Alphabetically Arranged, of All the Public Acts of Assembly Now In Force, and of General Use (1799).................................................................. 25

Laws and Ordinances of New Netherland, 1638-1674 (1868) .................20, 22

Oregon Code 1930 (1930), § 72-213 ............................................................. 7

Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey, Legislature Number 1.................... 26

**Other Authorities**

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)................................................................. 24

David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147 (Winter 1996) ............................................................................ 5

Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History" in Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ...........16, 17

Randolph Roth, *American Homicide* (2009) .................................................... 16

v

**INTRODUCTION**

The district court erred by holding that 18 U.S.C. § 922(k)'s prohibition on the possession of a firearm with a removed, obliterated, or altered serial number facially violates the Second Amendment. That provision is constitutional because "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008), and because it is "consistent with the Nation's historical tradition of firearm regulation," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). In his answering brief, Price fails to rebut the government's arguments and advocates an erroneous and unworkable view of the Supreme Court's decision in *Bruen*. This Court should reverse.

**ARGUMENT**

**I.     The District Court Erred by Concluding That 18 U.S.C. § 922(k) Is Unconstitutional.**

"[T]o declare an Act of Congress unconstitutional . . . is the gravest and most delicate duty that [a c]ourt is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring). The Supreme Court has said that "[p]roper respect for a coordinate branch of the government requires that [the Court] strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated."

1

*National Federation of Indep. Business v. Sebelius*, 567 U.S. 519, 538 (2012) (brackets and quotation omitted). The district court improperly struck down § 922(k) even though that provision prohibits conduct unprotected by the Amendment's text and is consistent with the nation's historical tradition.

Since the district court's dismissal order, every district court to consider the question has rejected the district court's reasoning in this case and held that § 922(k) is constitutional. *See United States v. Holton*, No. 3:21-cr-482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022); *United States v. Reyna*, No. 3:21-cr-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022); *United States v. Tita*, No. 1:21-cr-334, 2022 WL 17850250 (D. Md. Dec. 22, 2022); *United States v. Serrano*, No. 3:21-cr-1590, 2023 WL 2297447, at *7-*14 (S.D. Cal. Jan. 17, 2023). This Court should follow those courts' sound analysis and reverse the decision below.

**A.     The Second Amendment's text does not protect possession of a firearm with an obliterated serial number.**

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. But that right "is not unlimited," *Heller*, 554 U.S. at 626, and it does not protect the conduct regulated by § 922(k). As the Supreme Court has explained, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. And firearms with

2

obliterated serial numbers are not "typically" possessed at all, much less for lawful purposes. *See* Gov't Opening Br. 17-18. Indeed, the Third Circuit has observed that such firearms "are of particular value to those engaged in illicit activity" and that there "appear[ed] to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm." *United States v. Marzzarella*, 614 F.3d 85, 95, 98 (3rd Cir. 2010), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111.

Price does not—because he cannot—explain how the district court's holding is consistent with *Heller*'s statement that the Second Amendment does not protect firearms "not typically possessed . . . for lawful purposes." *Heller*, 554 U.S. at 625. Price first contends that this test "derives not from the Second Amendment's text, but from historical tradition." Br. 7. But *Heller* said this limitation was consistent with the "historical understanding" and "original understanding" of the Second Amendment, *Heller*, 554 U.S. at 625, terms that describe how a provision's *text* was understood at the time it was adopted. As one district court has explained, this limitation in *Heller* "comes from the text of the Second Amendment, so whether a particular type of gun is typically used by law-abiding citizens for lawful purposes is a proper question at the first step of the [*Bruen*] analysis." *Reyna*, 2022 WL 17714376, at *4.

3

Even if Price were correct that "the 'common use' and 'lawful purposes' limitations have no role to play at *Bruen*'s first prong" and are "only relevant at *Bruen*'s step two," Br. 7, *Heller*'s authoritative interpretation of the Amendment's "historical understanding" settles the question.  Whether as a matter of text, historical tradition, or both, the Amendment does not protect weapons "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

Price next contends that "the government recites only half the relevant test" and that a weapon is protected unless it is both (a) not in "'common use'" and (b) "'dangerous and unusual.'"  Br. 8.  Price misreads *Heller*.  The Court's reference to weapons "typically possessed by law-abiding citizens for lawful purposes" summarized a paragraph in which the Court explained that the colonial militia "was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  *Heller*, 554 U.S. at 624-25 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  In a later paragraph, the Court explained that this "'common use'" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* at 627.  But the Court did *not* suggest that where a weapon is not "in common use" for "lawful purposes like self-defense" it is nevertheless protected unless the government shows it is *also* particularly

4

dangerous.  Price's contrary argument fails to take *Heller*'s clearly articulated limitation on the right at face value.

Contrary to Price's claim, the government has shown that "unserialized firearms are not 'typically possessed by law-abiding citizens for lawful purposes.'"  Br. 9 (quoting *Heller*, 554 U.S. at 625).  Far from making a "naked, unsupported assertion" (Br. 10), the government quoted the leading post-*Heller* decision on § 922(k)'s constitutionality, which observed that it could not "'conceive of a lawful purpose for which a person would prefer an unmarked firearm.'"  Gov't Opening Br. 17 (quoting *Marzzarella*, 614 F.3d at 99).  The government also cited a law review article explaining that the only reason to obliterate a serial number is to avoid being connected to a crime.  *Id.* at 18 (citing David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996)).

These conclusions comport with common sense.  As the Third Circuit has explained, firearms with obliterated serial numbers "are of particular value to those engaged in illicit activity because the absence of serial numbers helps shield recovered firearms and their possessors from identification."  *Marzzarella*, 614 F.3d at 98.  On the other hand, "unmarked weapons are functionally no different from marked weapons," *id.* at 98-99, and therefore a

firearm with an obliterated number provides no advantages to a "law-abiding citizen[ ]" seeking to use a firearm for "lawful purposes," *Heller*, 554 U.S. at 625. Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Marzzarella*, 614 F.3d at 99.

Price asserts that "[a] private citizen might possess an unserialized firearm because they received it as a gift, because they legally bought it from a non-licensed dealer, because the serial number wore away, or for any other number of innocuous reasons."[1] Br. 9. But such situations are far from "typical[ ]," if they occur at all. *Heller*, 554 U.S. at 625. For 85 years, the federal government has prohibited the transportation, shipment, or knowing receipt in interstate commerce of firearms with obliterated serial numbers. Federal Firearms Act of 1938, Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251. And it has prohibited the possession of such firearms that have moved in interstate commerce for the last 33 years. Crime Control Act of 1990, Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856.

---

[1] Price consistently refers to "unserialized" firearms, but § 922(k) does not punish the possession of "unserialized" firearms, a term that includes legal pre-1968 firearms or contemporary privately made firearms. The statute punishes the possession (and transportation, shipment, and receipt) of firearms that have "had the importer's or manufacturer's serial number *removed, obliterated, or altered*." 18 U.S.C. § 922(k) (emphasis added).

Similarly, states have regulated the possession of firearms with obliterated serial numbers for at least 100 years. In 1923, California made it unlawful to "change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver" and made possession of a firearm with obliterated information "presumptive evidence" that the possessor had done the obliterating. 2 Consolidated Supplement to the Codes and General Laws of the State of California 2627 (1926), Act 1183, § 13 (enacted 1923). Other states soon followed suit. *See, e.g.*, 1 Revised States of New Jersey 1937 at 488-89 (1937) (enacted 1924); Oregon Code 1930 at 5498 (1930), § 72-213 (enacted 1925); 3 Compiled Laws of the State of Michigan 5859 (1929) (enacted 1927); 2 General Statutes of Connecticut: Revision of 1949, at 1550-51 (1949) (enacted 1930). As amici point out, 41 states now prohibit the obliteration of serial numbers, the possession of firearms with obliterated serial numbers, or both. Brief for the District of Columbia, et al., at 6-7 & nn.1-3, A1-A11. Thus, there is no factual or legal basis to conclude that a person could "legally" buy or receive as a gift a firearm with an obliterated serial number. Br. 9. At the very least, Price has not demonstrated that such firearms are "*typically* possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

7

Price incorrectly claims that the government has tried to "redefine the actual protected conduct." Br. 5 (emphasis omitted). In fact, the government agrees that the Second Amendment's plain text protects "keeping and bearing arms" and that weapons with obliterated serial number are "bearable arms." *Id.* But § 922(k) does not restrict "keeping and bearing arms" in general. Instead, it applies only to keeping and bearing a narrow class of unusual firearms—those with obliterated serial numbers. *See Reyna*, 2022 WL 17714376, at *4 (rejecting the argument that § 922(k) regulates "mere possession"). As just explained, "the Second Amendment does not protect those weapons." *Heller*, 554 U.S. at 625.

**B.    Even if the Second Amendment protected such firearms, § 922(k) would not infringe on the right to self-defense.**

Moreover, even if firearms with obliterated serial numbers were typically possessed for lawful purposes, § 922(k) would not "infringe" on the Second Amendment right to self-defense because it prohibits only a narrow class of firearms. *See* Gov't Opening Br. 18-20; *Holton*, 2022 WL 16701935, at *4 (holding that § 922(k) "does not infringe an individual's right to possess a firearm"); *Serrano*, 2023 WL 2297447, at *11 (same). Firearms with obliterated serial numbers are no more effective for self-defense than other firearms. And other firearms are far easier to obtain. Price's contrary arguments lack merit.

8

Price first claims that § 922(k) burdens the right to individual self-defense by subjecting "any individual possessing a post-1968 unserialized firearm" to "federal felony criminal jeopardy under Section 922(k) unless they forfeit their constitutional right to self-defense." Br. 10-11. But this misses the point. By prohibiting the possession only of a narrow class of unusual and long-prohibited firearms—those with obliterated serial numbers—§ 922(k) does *not* require people to "forfeit their constitutional right to self-defense." *Id.* A person can exercise the right to self-defense using firearms that have any serial number intact.

Price next cites (Br. 11) *Heller*'s rejection of the District of Columbia's argument, in support of its handgun ban, that "it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.* long guns) is allowed." *Heller*, 554 U.S. at 629. *Heller* explained that the handgun is "the quintessential self-defense weapon" and gave a list of reasons why a citizen "may prefer a handgun for home defense." *Id.* Section 922(k) is nothing like the handgun ban in *Heller*. It prohibits the possession only of a narrow category of hard-to-find firearms and leaves people free to possess the vast majority of handguns and long guns.

Price also quotes (Br. 11-12) a dissent from the denial of certiorari that hurts rather than helps him. In that dissent, Justice Thomas explained that

9

"[t]he question under *Heller* is not whether citizens have adequate alternatives available for self-defense. Rather, *Heller* asks whether the law bans types of firearms *commonly used for a lawful purpose*—regardless of whether alternatives exist." *Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) (emphasis added). As already explained, firearms with obliterated serial numbers are not "commonly used for a lawful purpose." *Id.* And Justice Thomas distinguished laws commonly used for lawful purposes from "weapons specially adapted to unlawful uses and not in common use, such as sawed-off shotguns." *Id.* Firearms with obliterated serial numbers, like sawed-off shotguns, are "specially adapted to unlawful uses" (evading tracing) and are "not in common use." *Id.* So nothing in this dissent helps Price.

Price finally contends that, because *Bruen* rejected the application of means-end scrutiny to Second Amendment claims, courts may not consider "the *size* of the burden placed on protected conduct" and that "[*a*]*ny* burden is impermissible, unless the United States conclusively proves it is consistent with a robust historical tradition of firearm regulation at the time of the Founding." Br. 12. Price's argument is incorrect in several ways. First, as explained above, § 922(k) does not "burden . . . protected conduct," *id.*, because firearms with obliterated serial numbers are "not typically possessed by law-abiding

10

citizens for lawful purposes." *Heller*, 554 U.S. at 625.  Second, *Bruen* endorsed the "shall issue" license-to-carry schemes of 43 states, which the Court recognized impose administrative burdens such as "background check[s]" and "firearms safety course[s]," without conducting an exhaustive historical analysis specific to that conclusion.  *Bruen*, 142 S. Ct. at 2138 n.9.  Like those "shall issue" schemes, § 922(k)'s prohibition on a limited category of weapons "do[es] not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."  *Id.*  Third, *Heller* said it was not calling into question "laws imposing conditions and qualifications on the commercial sale of arms," even though those laws often impose burdens (such as fingerprinting and paperwork) that do not have precise historical analogues.  *Heller*, 554 U.S. at 626-27.  This indicates that administrative burdens that stop well short of an "absolute prohibition" on firearm possession, *id.* at 636, do not require the government to demonstrate a specific historical analogue.

## C.    Section 922(k) is consistent with the Nation's tradition of firearm regulation.

In any event, § 922(k) is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, because it is analogous to historical laws regulating firearms and gunpowder.  *See* Gov't Opening Br. 21-27.  Those include (1) colonial laws regulating the firearms trade between

11

colonies and prohibiting the sale of firearms to Native Americans, *id.* at 21-22;

(2) early state laws requiring marking and inspection of gunpowder and

prohibiting the alteration of such marks, *id.* at 22-23; (3) colonial and early

state laws prohibiting the transportation of gunpowder without a license, *id.* at

23-24; and (4) early state laws requiring proof marks on gun barrels and

prohibiting the alternation of those proof marks, *id.* at 24-26.  Those historical

laws are analogous to § 922(k) because they impose a "comparable burden"

that is "comparably justified."  *Bruen*, 142 S. Ct. at 2133; *see* Gov't Opening Br.

26-27.

The three other district courts to consider the question after *Bruen* have

all correctly determined that "§ 922(k) is consistent with this Nation's history

and tradition of firearm regulation."[2]  *Serrano*, 2023 WL 2297447, at *12; *see*

*Holton*, 2022 WL 16701935, at *5; *Tita*, 2022 WL 17850250, at *7-*8.  The

district court's contrary conclusion was error, and Price fails to rebut the

government's argument that reversal is required.

---

[2] A fourth district court upheld § 922(k) without examining historical
analogues given its conclusion that "§ 922(k)'s regulated conduct is outside
[the] scope of the Second Amendment."  *Reyna*, 2022 WL 17714376, at *5.

### 1. Price incorrectly attempts to reframe the historical inquiry.

Price tries to reframe the historical inquiry in several ways that are inconsistent with *Bruen*. He first attempts to dramatically constrict the relevant historical period, arguing that "courts should look to the . . . laws and traditions followed by the first thirteen states between mid-1787 and the end of 1791." Br. 16. *Bruen* and *Heller* appropriately looked to laws from a far broader period to interpret a right that was already "venerable" by the time of the Second Amendment. *Heller*, 554 U.S. at 605. *Bruen* observed that, "[a]s in *Heller*, we consider th[e] history 'between the Stuart Restoration in 1660 and the Glorious Revolution in 1688' to be particularly instructive." *Bruen*, 142 S. Ct. at 2140 (brackets omitted) (quoting *Heller*, 554 U.S. at 592). *Heller* and *Bruen* both indicated that colonial- and revolutionary-era laws are relevant. *See Heller*, 554 U.S. at 594-95, 600-04; *Bruen*, 142 S. Ct. at 2142-45. *Heller* also considered post-ratification sources, describing the "public understanding of a legal text in the period after its enactment or ratification" as "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605 (emphasis omitted); *see id.* at 606-08 (discussing legal commentaries from 1825 and 1833). Thus, the historical inquiry cannot, as Price claims, be cabined to a 4.5-year period immediately surrounding the Bill of Rights' adoption. Requiring a precise

analogue enacted during that brief period would be to impose a "regulatory straightjacket" of the kind that *Bruen* rejected.  *Bruen*, 142 S. Ct. at 2133.

Price next claims, incorrectly, that *Bruen* "sets out two different inquiries," depending on whether a modern regulation (a) "'addresses a general societal problem that has persisted since the 18th century'" or (b) "'implicat[es] unprecedented societal concerns or dramatic technological changes.'"  Br. 17-18 (quoting *Bruen*, 142 S. Ct. at 2131-32).  He contends that the first category requires a "distinctly similar" historical analogue, whereas the second category requires only a "relevantly similar" analogue.  *Id.* at 17-18 (emphasis and quotation omitted); *see id.* at 22 (accusing the government of "completely miss[ing] (perhaps deliberately)" this distinction).

*Bruen* does not support this two-tiered test.  *Bruen* set out a variety of guideposts for "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Bruen*, 142 S. Ct. at 2131.  But these guideposts were all part of a single test for determining whether a modern regulation is "analogous enough" to "historical precursors" to "pass constitutional muster."  *Id.* at 2133.  The Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  *Id.* at 2132.  Although the Court did

14

not provide "an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it identified "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. And the Court emphasized that this "analogical reasoning" was not a "regulatory straightjacket" but requires only "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

Price places far too much weight on *Bruen*'s single use of the term "distinctly similar." Br. 17-18. *Bruen* said that, if a modern regulation "addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation . . . is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). The Court did not state that a "distinctly similar" regulation was *necessary* to uphold the statute. Nor did it use the term "distinctly similar" anywhere else in its opinion, including when considering the New York law at issue. *Id.* at 2138-56. In short, *Bruen*'s single reference to a "distinctly similar" regulation does not suggest that it created a heightened standard for certain types of modern regulations.

In any event, the "regulatory challenges posed by firearms today" are sufficiently distinct from those that "preoccupied the Founders" to call for a

flexible approach. *Bruen*, 142 S. Ct. at 2132. Although firearm violence and the need to solve firearm crimes were problems that "existed in 1791," Br. 20, they have changed significantly over the intervening centuries. For one thing, the rates of firearm violence were much lower in the century preceding the American Revolution than they are today. "In the final quarter of the seventeenth century the murder rate in the colonies suddenly dropped," and it "remained low by historical and modern standards for nearly eighty years, until the revolutionary crisis of the 1760s and 1770s." Randolph Roth, *American Homicide* 61 (2009). During the pre-revolutionary period, "the proportion of victims murdered with guns fell to only 13 percent in New England and 11 percent in Maryland." Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History" in Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 119 (2019). Even when "the homicide rate rebounded" during the American Revolution, "the proportion of homicides of unrelated white people committed with firearms never rose above two-fifths, except on contested frontiers." *Id.* at 119-120. "That proportion is far below the 70 percent that prevails in the United States today." *Id.* at 120.

16

Firearms were less commonly used for murders in the eighteenth century in part because of their technological limitations. Eighteenth-century firearms ordinarily fired only one shot, took a long time to load (from the muzzle), were subject to misfires, and could not be kept loaded for long periods because black powder absorbed moisture. *See* Roth, "Why Guns Are and Are Not the Problem," *supra*, at 117. But the advent of metallic cartridges and inexpensive and ubiquitous repeating firearms (including revolvers) led to increased gun use in homicides. *Id.* at 121-27. Along with changed societal concerns such as a rise in homicide rates, these "technological changes" may explain why founding-era legislatures did not enact measures identical to § 922(k). *Bruen*, 142 S. Ct. at 2132.

Moreover, § 922(k) takes advantage of technological advancements occurring since the founding. Price points out that barrel proof marks were used on some firearms in England as early as the 1630s. Br. 21, 26. But those proof marks did not, like serial numbers, distinguish firearms of the same make from one another. *See* Proof Marks, https://www.nramuseum.org/media /940944/proofmarks.pdf. Serial numbers only came into common (though not universal) use in America with the advent of mass production in the mid-1800s. *See* Gov't Opening Br. 29-30. Thus, as the government explained, technological limitations would have "made a statute exactly like § 922(k)

unrealistic" at the founding, *id.* at 31, and therefore the government cannot point to a "historical twin," *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). What the government *can* do is point to historical analogues showing that § 922(k) is not an "outlier[ ] that our ancestors would never have accepted." *Id.* (quotation omitted). And even if Price were correct that the government must point to "distinctly similar" historical regulations, it has done so here by identifying historical laws prohibiting the alteration of proof marks on firearms and inspection marks on gunpowder.

Price contends that, in the district court, the government "failed to put forward any of the evidence or arguments it now contends require the district court to be reversed" and was "content to rest on the assertion Section 922(k) is a commercial firearm regulation." Br. 21. That is incorrect. The government argued below that "[t]here is a longstanding historical tradition of restricting the *types* of weapons that can be possessed." J.A.51. And although the government referred to historical regulations on the "commercial sale of arms," J.A.53 (quoting *Heller*, 554 U.S. at 627), it also referred to laws "governing the manufacture, sale, [and] transport of guns and ammunition," *id.* (quotation omitted), and cited one of the two barrel-proofing laws relied on in the opening brief, *id.* So the government provided the district court with ample argument and historical statutes to decide this case. Moreover, this

18

Court "may take judicial notice of legislative facts," *United States v. Gavegnano*, 305 Fed. App'x 954, 956 (4th Cir. 2009) (per curiam) (unpublished), including the contents of historical statutes, *see United States v. Williams*, 442 F.3d 1259, 1261 (10th Cir. 2006) ("Statutes are considered legislative facts . . . .").

### 2. Price fails to rebut the specific historical examples identified by the government.

As explained in the government's opening brief (at 21-27), a variety of historical laws are analogous to § 922(k).  Price's attempts to distinguish those laws (Br. 24-27) based on "how" and "why" the burden protected conduct are unavailing.

Price does not identify any distinctions between "how" § 922(k) and historical barrel-proof laws burden firearms rights.  *See* Br. 25-27.  Indeed, he appears to recognize that the historical laws, like § 922(k), prohibited removal of markings on firearms.  Br. 27 (comparing the laws to a "do not remove" tag).  He does attempt to distinguish gunpowder-related laws on the basis that their penalties did not include "firearm disarmament or imprisonment."  Br. 25.  But, as Price acknowledges, the penalties included "forfeiture of non-conforming gunpowder."  *Id*.  They could also include fines of up to $500 in some states, *see* 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823) (1809 law); Charter and Ordinances of the City of Providence, with the General Assembly Relating to

19

the City 37 (1835) (1821 law).  Moreover, regardless of how severely violations
were punished, these statutes imposed a "comparable burden" on conduct by
flatly forbidding the sale of condemned powder, the defacing of inspection
marks, and unlicensed trade in powder.  *See* Gov't Opening Br. 22-23.

Although Price summarily asserts that laws prohibiting the sale of
firearms to Native Americans did not impose "comparable burdens" to
§ 922(k), Br. 27, he does not reconcile that assertion with the severe penalties
authorized by many of those laws, *see* Laws and Ordinances of New
Netherland, 1638-1674, 278 (1868) (1656 ordinance authorizing death
penalty); 1 Statutes at Large: Being a Collection of All the Laws of Virginia,
from the First Session of the Legislature, in the Year 1619, at 441 (1823) (1657
law requiring estate forfeiture); 5 Records Of The Colony Of New Plymouth
173 (1856) (1675 law requiring the death penalty); 6 Statutes at Large of
Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law requiring
payment of a £500 fine, whipping, and 12 months in jail).  Particularly given
the minimal or non-existent burden that § 922(k) places on the right to self-
defense (given the availability of other legal arms), the burden imposed by
these laws is at least "comparable" to, if not far greater than, that imposed by
§ 922(k).  And Price does not attempt to distinguish the burdens imposed by
other colonial regulations on commerce in firearms and gunpowder, such as

20

those prohibiting sales to other colonies or requiring a license.  *See* Br. 27;

Gov't Opening Br. 21, 23.

Price also unsuccessfully attempts to distinguish historical gunpowder

and barrel-proofing regulations based on "why" they burdened the right to self-

defense.  Br. 24-27.  He points out that these laws "regulated commerce as a

matter of consumer and product safety," Br. 24, and were "adopted to protect

firearm end-users and to improve firearm safety," Br. 27.  This differs, he

asserts, from § 922(k)'s purpose of "aid[ing] in solving crimes" and keeping

firearms "away from 'dangerous people.'"  Br. 24.  But *Bruen* does not require

that modern and historical laws have the same purpose; it only requires that

they be "comparably justified."  *Bruen*, 142 S. Ct. at 2133.  And Price has failed

to demonstrate that solving firearm-related crimes and preventing criminals

from using untraceable firearms are not "comparabl[e]" justifications to

protecting people from poorly manufactured firearms or gunpowder.

Price also fails to distinguish historical laws regulating the sale of

firearms and gunpowder based on "why" they burdened conduct.  Br. 27.  He

asserts that the government "offers no actual evidence" that the statutes

prohibiting sales to Native Americans reflected a founding-era concern about

"'the movement of firearms between private parties and the dangers of firearms

falling into the wrong hands.'"  *Id.* (quoting Gov't Opening Br. 22).  But the

21

government's assertion is evident, if not from those laws' requirements themselves, at least from the explanations that several of those laws provide. *See, e.g.,* 1 Archives of Maryland, Proceedings and Acts of the General Assembly of Maryland, January 1637/8 – September 1664, at 307 (1883) (1650 law) (noting threat to "the publick peace or safety of this province" from "warre," "Insurrection," and "mischeife" committed against "people of or in this province"); Laws and Ordinances of New Netherland, 1638-1674 at 47 (1868) (1645 ordinance) (noting "serious injury" to the country and that "our enemies are better provided with Powder than we"); 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319 (1899) (1763 law) (noting "cruel and barbarous murders on the inhabitants" of the province and the "dangerous consequence[s]" of supplying Native Americans with arms).

Even when sales to Native Americans were not completely banned, they were taxed or required a license from colonial authorities. *See* Colonial Laws of Massachusetts. Reprinted from the Edition of 1660, with the Supplements to 1672[,] Containing Also, the Body of Liberties of 1641, at 240-41, 285 (1889) (1668 and 1680 laws); 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law). Although Price summarily asserts that "such purposes still do not share sufficiently comparable . . . justifications with Section 922(k)," Br. 27, he fails to explain how that is true given those laws'

22

goal of controlling the firearm trade to prevent firearms from being used to commit violence. Nor does he attempt to distinguish historical regulations regulating commerce in arms or gunpowder between or within the colonies. *See* Gov't Opening Br. 21, 23. In short, Price has not rebutted the government's arguments demonstrating that § 922(k) and these historical laws impose a "comparable burden" and are "comparably justified." *Bruen*, 142 S. Ct. at 2133.

Price makes a few other arguments unconnected to "how" and "why" the historical regulations burdened protected conduct. For one thing, he implicitly faults the government for citing statutes outside of the narrow 4.5-year period that he contends is relevant. *See* Br. 24-25, 27 (emphasizing the time periods of the cited laws). As explained above, *Heller* and *Bruen* considered laws from the colonial period and the early republic. *See Bruen*, 142 S. Ct. at 2140; *Heller*, 554 U.S. at 605. And Price fails to explain how a demonstrated historical tradition that existed both *before* and *after* the period he considers relevant is insufficient. *See* Br. 16.

Price also contends that the statutes cited by the government are not "representative" because they come from only five jurisdictions (in the case of gunpowder-related laws) or two jurisdictions (in the case of barrel-proof laws). Br. 28. He cites (*id.*) *Bruen*'s expression of "doubt that *three* colonial

23

regulations could suffice to show a tradition of public-carry regulation." *Bruen*,

142 S. Ct. at 2142. As an initial matter, *Bruen* does not indicate that examples

from two or three jurisdictions are always insufficient to show a tradition of

firearm regulation. *Bruen* went on to say that, in any event, it was "not

convinced" that the three cited laws "regulated public carry akin to the New

York law before us." *Id.* And when concluding that "sensitive places" laws

are "constitutionally permissible," *Bruen* cited a law review article identifying

sensitive-places laws in only two jurisdictions prior to Reconstruction. *Id.* at

2133 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13

Charleston L. Rev. 205, 229-236, 244-47 (2018)). *Bruen* acknowledged that

"the historical record yields relatively few 18th- and 19th-century 'sensitive

places' where weapons were altogether prohibited," but observed that it was

"aware of no disputes regarding the lawfulness of such prohibitions" and could

therefore "assume it settled that these locations were 'sensitive places' where

arms carrying could be prohibited consistent with the Second Amendment."

*Id.* Thus, *Bruen* indicates that even a handful of statutes can establish a

historical tradition where the laws' constitutionality was not in dispute, as is

true here.

Moreover, Price is simply wrong in claiming that only "[t]hree out of

thirteen states regulat[ed] gunpowder." Br. 28. In its opening brief, the

24

government focused on laws relating to the manufacture, marking, and

transportation of gunpowder because those most closely resemble § 922(k).

But at least nine states or colonies regulated gunpowder *storage*, requiring larger

quantities in certain cities to be kept in the public magazine.[3]  And even with

respect to gunpowder marking and transportation laws, the government's

opening brief included a representative but non-exhaustive set of examples.

Beyond the three states discussed in the opening brief (Pennsylvania,

Massachusetts, and New Hampshire), at least two other states enacted

gunpowder-inspection laws that required gunpowder to be marked in specific

ways.  *See* 8 Records of the State of Rhode Island and Providence Plantations

in New England, 18 (1863) (1776 law requiring inspector to mark cask "with

the two first letters of the manufacturer's name" and "with the letters U.S.A.");

Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of

---

[3] *See, e.g.*, 2 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 23-24, 136-37 (1874) (1715 & 1719 laws); 18 Colonial Records of the State of Georgia 301 (1910) (1759 law); Acts and Laws of the English Colony of Rhode-Island and Providence-Plantations, in New-England, in America 116-17 (1767) (1762 law); 4 Statutes at Large of South Carolina 319-20 (1838) (1770 law); 8 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 611-13 (1821) (1772 law); 11 Statutes at Large of Pennsylvania 209-10 (1906) (1783 law); 2 Laws of the State of New-York 95-96 (1802) (1788 law); Digest of the Laws of Maryland, Being an Abridgment, Alphabetically Arranged, of All the Public Acts of Assembly Now In Force, and of General Use 357 (1799) (1791 law); 1 Laws of the State of New-Hampshire, with the Constitutions of the United States and of the State Prefixed 460-61 (1815) (1794 law).

25

the State of New-Jersey, Legislature Number 1 at 7 (1776 law requiring

inspector to mark casks "with the Letters S N I").  Although the government

has not found additional barrel-proof laws beyond those enacted by

Massachusetts and Maine, the government has not located evidence of

"disputes regarding the lawfulness of such prohibitions."  *Bruen*, 142 S. Ct. at

2133.  Taken together, all these laws are "representative" examples of

analogous historical regulations.

### D. The district court erred by striking down § 922(k) as facially invalid.

Finally, the district court erred by finding § 922(k) unconstitutional on its

face.  *See* Gov't Opening Br. 31-34.  The statute is, at the very least,

constitutional as applied to felons like Price who are prohibited from

possessing all firearms.  The district court failed to apply the well-established

rule that a successful facial challenge requires a showing that a law "is

unconstitutional in all its applications."  *Bucklew v. Precythe*, 139 S. Ct. 1112,

1127 (2019).

Price contends that this rule does not apply here because the felon-in-

possession prohibition in § 922(g)(1) "does not involve application of Section

922(k) at all."  Br. 30.  He relies on *City of Los Angeles, Cal. v. Patel*, 576 U.S.

409 (2015), where the city argued that a law allowing warrantless searches of

hotel registries was not "unconstitutional in all applications" because, in at

least some searches, police would actually have a warrant or be acting under an exception to the warrant requirement. *Id.* at 417-18. The Supreme Court rejected that argument, explaining that the search in such a situation could "proceed *irrespective* of whether it is authorized by statute" and that these "constitutional 'applications'" therefore "do not involve actual applications of the statute." *Id.* at 418-19 (emphasis added).

This situation is readily distinguishable from *Patel*. Here, there can be no dispute that § 922(k) is being "applied" to Price based on his possession of a firearm with an obliterated serial number. The fact that he is also barred from possessing *any* firearm under § 922(g)(1) does not change this fact. Both statutes can, and do, apply to his conduct. *See Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) (observing that "[t]he Federal Criminal Code is replete with provisions that criminalize overlapping conduct"). And Price cites no authority indicating that the application of a separate, constitutional statute is not one of the "circumstances" that can defeat a facial challenge. *United States v. Salerno*, 481 U.S. 739, 745 (1987) (requiring a party bringing a facial challenge to "establish that no set of circumstances exists under which the Act would be valid).

Price argues that "*Bruen* itself could not have been decided under the Government's facial standard" because New York could have argued that its

27

"licensing regime would not have violated the Second Amendment if the applicant wanted the license to obtain a 'dangerous or unusual weapon' or wanted a firearm to help somebody escape from prison."  Br. 31-32.  But *Bruen* had no need to consider the distinction between facial and as-applied challenges.  The plaintiffs there were undisputedly law-abiding, responsible citizens, *Bruen*, 142 S. Ct. at 2134, and the challenged law "broadly prohibited the public carry of commonly used firearms for personal defense," *id.* at 2156.  Thus, based on *Bruen*'s reasoning, the law was clearly unconstitutional as applied to the plaintiffs, and *Bruen* did not indicate that it was invalidating the law on its face.

Price also cites *United States v. Rahimi*, 59 F.4th 163, 172 (5th Cir. 2023), *opinion withdrawn and substituted*, No. 21-11001, Doc. 154-1 (Mar. 2, 2023), where the Fifth Circuit concluded that, "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances."[4]  *Rahimi* was wrong to conclude that *Bruen* did away with the ordinary requirement that a party bringing a facial challenge "must establish that no set of circumstances exists under which the Act would be valid."

---

[4] The government will be seeking further review in *Rahimi*.  Statement of Attorney General Merrick Garland Regarding United States v. Rahimi, https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi.

*Salerno*, 481 U.S. at 745. In finding the New York law unconstitutional, *Bruen* neither mentioned nor overruled the ordinary requirements for facial challenges. In fact, it analogized its standard to "how we protect other constitutional rights" such as the First Amendment, 142 S. Ct. at 2130, where those ordinary rules unquestionably apply, *see Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-50 (2008). The same rules apply here and demonstrate that the district court erred by finding § 922(k) unconstitutional on its face.

## CONCLUSION

This Court should reverse the judgment of the district court.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

JENNIFER RADA HERRALD
Assistant United States Attorney
Southern District of West Virginia

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

29

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,489 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/William A. Glaser
WILLIAM A. GLASER
